**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION | |
| and | |
| THE SURFRIDER FOUNDATION, | |
| *Plaintiffs*, | |
| *vs.* | Case No. 1:20-cv-11827 |
| WILLIAM BARR, in his official capacity as United States Attorney General, | |
| UNITED STATES DEPARTMENT OF JUSTICE, | |
| ANDREW WHEELER, in his official capacity as Administrator of the Environmental Protection Agency, | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | |
| and | |
| JEFFREY CLARK, in his official capacity as United States Assistant Attorney General for the Environment and Natural Resources Division, Department of Justice, | |
| *Defendants*. | |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This lawsuit challenges an unlawful written policy relating to environmental statutes administered by the Environmental Protection Agency ("EPA") and litigated by the United States Department of Justice ("DOJ"), such as the Clean Air Act and Clean Water Act. The policy bars DOJ from settling enforcement actions via consent decrees that include

Supplemental Environmental Projects ("SEPs"). The policy has also been adopted by EPA for use in that agency's administrative enforcement actions.

2.     In a SEP, an alleged violator of an environmental statute commits to addressing the effects of pollution or forestalling future pollution through tangible, real-world projects. For example, a SEP might address Clean Water Act violations by installing safe drinking fountains in schools with a history of unhealthy drinking water. Other SEPs ameliorate air pollution by installing monitoring and pollution control devices.

3.     Because pollution disproportionately affects low income and minority communities, SEPs have been particularly helpful in reducing the impacts of pollution in these communities. In the last four decades, EPA, DOJ, and federal courts have approved hundreds of SEPs with important real-world benefits for the nation's air and water, and for the communities that depend on those resources for their health and welfare.

4.     EPA has continuously refined its SEP policy to ensure that SEP settlements are environmentally beneficial and also comport with applicable law, including the Miscellaneous Receipts Act. The Miscellaneous Receipts Act requires that money *received* by executive branch officials be deposited in the United States Treasury, lest an executive agency retain the funds and expend them absent congressional appropriations.

5.     For decades, the DOJ's Office of Legal Counsel ("OLC") has determined that settlements with SEPs and similar mechanisms do not violate the Miscellaneous Receipts Act when (1) SEPs are not funded with money that was otherwise obligated to the United States Treasury and (2) the executive branch retains no post-settlement control of the funds. These requirements ensure that the executive branch does not rely on SEPs to usurp Congress' power of the purse.

6.      A product of lengthy collaboration with OLC, EPA's most recent SEP policy more than meets these restrictions by requiring the agency to assess civil penalties independently of SEPs, thereby ensuring that SEPs do not rob the agency of funds "destined" for the treasury. EPA also guarantees that SEPs are independent of EPA programs, and indeed all federal programs, *except* those already endorsed by Congress, ensuring that SEPs in no way provide the agency a "back door" to appropriate its own funds.

7.      Jeffrey Clark is the current Assistant Attorney General of the Department of Justice's Environment and Natural Resource Division ("ENRD"). In March of 2020, Assistant Attorney General Clark abruptly concluded—contrary to official DOJ and EPA policies that remain on the books—that SEPs violate the Miscellaneous Receipts Act. The Assistant Attorney General explicitly rested this conclusion on his personal research, determining in a memorandum ("the Clark Memorandum") that SEPs violated the Act.

8.      Assistant Attorney General Clark's memorandum misreads the Miscellaneous Receipts Act, EPA's SEP policy, and DOJ's longstanding conclusions regarding settlements such as SEPs.

9.      The Clark Memorandum will have significant real-world effects on communities that would otherwise benefit from SEPs, particularly poor and low-income communities, and runs directly counter to Congress' design when passing laws such as the Clean Water Act and Clean Air Act.

10.     Among the areas most likely to suffer from the Clark Memorandum are New England (particularly the Boston area) and the greater Chicago area (including the Lake Michigan shore between Chicago and Gary, Indiana).

11.     Prior to the Clark Memorandum, these regions routinely benefited from judicial and administrative SEPs that directly addressed the region's air and water pollution. Because this pollution and violations of federal environmental laws are ongoing, SEPs would, in the ordinary course, continue to directly ameliorate health, aesthetic, and recreational injuries in the area. Without SEPs, those injuries will pose more acute threats to local residents, including the memberships of Plaintiffs Conservation Law Foundation ("CLF") and Surfrider Foundation ("Surfrider"), two non-profit organizations dedicated to conservation of natural resources and the prevention and amelioration of air and water pollution.

12.     Further, the Clark Memorandum will prompt CLF to divert significant resources to increased monitoring and enforcement of federal environmental laws, to the detriment of its other conservation programs.

13.     Because these effects flow entirely from an arbitrary, unreasoned, and unlawful interpretation of the Miscellaneous Receipts Act, the Court should vacate the Clark Memorandum and EPA's adoption thereof and enjoin DOJ and EPA from implementing the memorandum in any way.

## PARTIES

14.     Defendant WILLIAM BARR is the Attorney General of the United States and has ultimate authority over the Department of Justice and its civil enforcement attorneys. He is sued in his official capacity.

15.     Defendant UNITED STATES DEPARTMENT OF JUSTICE is an agency within the executive branch of the federal government responsible for representing the United States in civil litigation, including actions enforcing statutes under the EPA's administration.

16.     Defendant ANDREW WHEELER is the Administrator of the Environmental Protection Agency, and has ultimate authority over that agency's administration of the federal environmental statutes described herein. He is sued in his official capacity.

17.     Defendant ENVIRONMENTAL PROTECTION AGENCY is an agency of the federal government charged with implementing statutes such as the Clean Water Act, the Clean Air Act, and the Resource Conservation and Recovery Act. It refers potential civil enforcement actions to the United States Department of Justice.

18.     Defendant JEFFREY CLARK is the Assistant Attorney General for the Department of Justice's Environment and Natural Resources Division, which generally oversees civil enforcement actions on behalf of EPA. He has day-to-day authority over the Division's prosecutorial policies and signed the Memorandum that is the subject of this lawsuit. He is sued in his official capacity.

19.     Plaintiff CONSERVATION LAW FOUNDATION ("CLF") is headquartered in Boston, Massachusetts. CLF has over 4,000 members, and the organization's mission is to protect New England's environment for the benefit of all people. CLF uses the law, science, and the market to create solutions that preserve New England's natural resources, build healthy communities, and sustain a vibrant economy. In particular, CLF regularly brings lawsuits to enforce clean water and clean air laws, including by using the citizen suit provisions of the Clean Air Act and Clean Water Act. CLF typically seeks to include payments to SEPs in citizen lawsuit settlement agreements or in court orders following a legal victory. To date, CLF's environmental enforcement work has generated more than $2,000,000 in funding for local environmental protection and restoration projects.

20.     Plaintiff THE SURFRIDER FOUNDATION is a non-profit corporation with its principal office in San Clemente, California. Surfrider is a national grassroots organization with more than 350,000 supporters and members, 79 local chapters, and 92 school clubs in the United States. Five of these chapters are within the Great Lakes Region and include the Chicago Chapter (with 250 members) and Northern Ohio Chapter (with 128 members).

21.     Surfrider's mission is the protection and enjoyment of the world's oceans, waves, and beaches, for all people, through a powerful activist network. Through its membership network, Surfrider advocates for clean water and ocean protection, coastal preservation, public beach access, and the prevention of marine plastic pollution. Surfrider's vision is to keep beaches open to everyone, promote smart coastal development that avoids coastal impacts, ensure that water is clean for coastal recreation including surfing and swimming, keep beaches free of plastic litter, and protect special ocean and coastal places when and before they are threatened. Surfrider's Clean Water Initiative seeks to protect water resources and prevent pollution along coasts and waterways by engaging communities, testing water, planting ocean friendly landscapes, and advocating for holistic clean-water solutions.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(C) because Plaintiff CLF resides in this district.

//
//

## LEGAL BACKGROUND

### I.    Federal Environmental Enforcement Actions and Settlements

24.    Federal enforcement of environmental statutes generally occurs through administrative actions (brought by EPA) or through civil actions (brought by DOJ, on behalf of client agencies like EPA).

25.    Most environmental enforcement occurs through federal administrative action. Federal departments and agencies have enforcement authority under a variety of environmental statutes.[1] The EPA exercises primary enforcement responsibility for many of these laws.

26.    The DOJ can also bring civil enforcement actions on behalf of client agencies. Federal environmental statutes provide for civil judicial enforcement to secure injunctive relief, civil penalties, recovery of government response costs, enforcement of administrative orders, or other relief.[2]

27.    The DOJ, on behalf of EPA, can also intervene as a matter of right in citizen suits brought under environmental statutes like the Clean Water Act (*see* 33 U.S.C. § 1365(c)(2)) and Clean Air Act (*see* 42 U.S.C. § 7604(b)(1)(B)), if the government is not already joined as a party.

28.    The Attorney General is charged with conducting and supervising all litigation to which the United States, or its departments or agencies, is a party. 28 U.S.C. §§ 515-519. *See*

---

[1] These laws include the Clean Air Act (42 U.S.C. §§ 7401-7431), the Clean Water Act (33 U.S.C. §§ 1251-1275), the Oil Pollution Act (33 U.S.C. §§ 2701-2720), the Safe Drinking Water Act (42 U.S.C. §§ 300f-300j-27), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136-136y), the Toxic Substances Control Act (15 U.S.C. §§ 2601-2629), the Resource Conservation and Recovery Act ("RCRA") (42 U.S.C. §§ 6901-6908a), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") (42 U.S.C. §§ 9601-9675), and the Emergency Planning and Community Right-to-Know Act (42 U.S.C. §§ 11001-11050).

[2] *See*, *e.g.*, 42 U.S.C. § 7414 (Clean Air Act), 33 U.S.C. §§ 1319(b), 1321 (Clean Water Act); 42 U.S.C. § 300g-3(b) (Safe Drinking Water Act); 33 U.S.C. § 2702 (Oil Pollution Act); 42 U.S.C. §§ 6928(a), 6973 (RCRA); 42 U.S.C. §§ 9606, 9607 (Comprehensive Environmental Response, Compensation, and Liability Act).

*also* The Att'y Gen.'s Role as Chief Litigator for the U.S., 6 Op. O.L.C. 47, 48 (1982). The Attorney General has delegated civil enforcement of the environmental laws to ENRD's Assistant Attorney General. 28 C.F.R. § 0.65; U.S. Att'ys' Manual 5-1.100, 5-1.300 (Updated 2018).

29.     Because ENRD does not have investigative staff, EPA and other federal agencies investigate and "refer" most civil cases to DOJ.[3] In many cases, EPA has the discretion to decide whether a matter is best addressed administratively or through judicial enforcement, considering, among other things, whether the violation calls for greater deterrent impact, requires long-term or complex compliance measures, or has important legal implications, all of which favor pursuing judicial enforcement.

30.     In some cases, statutory limitations on administrative authorities compel agencies to refer alleged violations to DOJ for civil enforcement.[4]

31.     DOJ conducts its own independent review of each referral to determine whether judicial enforcement is warranted. Not all the cases referred to DOJ are pursued, and not all cases that are pursued are the subject of a civil complaint for relief (e.g., they may result in pre-filing settlement).

---

[3] *See* U.S. EPA, General Enforcement Policy Compendium (Dec. 1994), https://nepis.epa.gov/Exe/ZyPDF.cgi/9100TIBO.PDF?Dockey=9100TIBO.PDF.

[4] For example, some statutes impose caps on the amount of civil penalties that can be assessed administratively. *See, e.g.*, 42 U.S.C. § 7413(d) (Clean Air Act) ($200,000 limit, unless waived by DOJ); 33 U.S.C. § 1319(g)(2)(B) (Clean Water Act) ($125,000 limit for class II penalties); 42 U.S.C. § 300g-3(g)(3) (Safe Drinking Water Act) ($25,000 limit).

32.     After DOJ approves an enforcement action, it typically gives the prospective

defendant notice of the proposed claim and an opportunity to settle prior to filing. *See* Exec.

Order No. 12988, 61 Fed. Reg. 4729, 4729 (Feb. 5, 1996).[5]

33.     If a civil complaint is filed, ENRD typically will seek, among other remedies, an

order that the defendant pay an appropriate civil penalty for the violation. Civil penalties punish

a defendant for its violations and deter future violations by the defendant and the public. Most

federal environmental laws specify maximum penalty amounts for each violation and a set of

statutory factors to guide judicial penalty determinations.[6]

34.     DOJ, in consultation with the client agency, determines an appropriate penalty

range for the case *after* considering a suite of other variables such as the nature, circumstances,

extent, and gravity of the violation, or violations, and the violator's ability to pay, prior history of

violations, decree of culpability, economic benefit of noncompliance or savings, and other

matters as justice may require.[7]

35.     Most enforcement actions the EPA refers to the DOJ are resolved through

settlement agreements or consent decrees. Those settlements or decrees usually stipulate the

penalty amount paid to the United States Treasury that not only recoups the economic benefit of

---

[5] In addition to the Executive Order notice requirements, many environmental statutes require notice of the commencement of the action to the relevant state regulatory agency. *See, e.g*., 33 U.S.C. § 1319(g) (Clean Water Act); 42 U.S.C. § 7413(b) (Clean Air Act); 42 U.S.C. § 6928(a)(2) (RCRA).

[6] For example, Section 113(e) of the Clean Air Act requires the court to consider "the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation . . . , the economic benefit of noncompliance, and the seriousness of the violation." 42 U.S.C. § 7413(e)(1). *See also* 33 U.S.C. § 1319(d) (Clean Water Act).

[7] *See e.g.,* U.S. EPA, Policy on Civil Penalties: EPA General Enforcement Policy #GM-21, 17-28 (Feb. 16, 1984), https://www.epa.gov/sites/production/files/documents/epapolicy-civilpenalties021684.pdf.

noncompliance, but also imposes an additional amount to sanction the violator and deter future violations.

36.     Most federal consent decrees are subject to a notice and comment period to consider whether the decree is inappropriate, improper, inadequate, or inconsistent with statutory requirements. *See* 42 U.S.C. § 7413(g) (Clean Air Act settlements); 42 U.S.C. § 9622(d)(2), (i) (CERCLA settlements). *See also* 42 U.S.C. § 6973(d) (RCRA settlements).[8]  Concurrent with lodging with the relevant court, the government publishes a notice in the Federal Register, usually giving a 30-day opportunity to comment, and makes the decree available to the public on the DOJ website.

37.     DOJ may conclude, based on the comments, that changes to the proposed settlement are necessary. If it decides to proceed with the consent decree, it will then move to enter it. The motion to enter will discuss the basis for the settlement and the applicable law. Courts have established the standard for entry to be whether the settlement is fair, reasonable, and consistent with public policy, and they have also recognized the advantages of resolving cases through settlement and the deference that must be accorded the government in negotiating the terms of the settlement. *See United States v. Se. Pa. Transp. Auth*., 235 F.3d 817, 823 (3d Cir. 2000) ("A court should approve a proposed consent decree if it is fair, reasonable, and consistent with CERCLA's goals."); *United States v. Cannons Eng'g Corp*., 899 F.2d 79, 84 (1st Cir. 1990) ("The relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute."); *Sierra Club, Inc. v. Elec. Controls Design,*

---

[8] Not all environmental statutes explicitly require that settlements be subject to notice and comment. Neither the Endangered Species Act nor the Clean Water Act, for example, contain such a requirement.

*Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990); *see also United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (9th Cir. 1995).

38.     Substantive fairness focuses on corrective justice and accountability: "a party should bear the cost of the harm for which it is legally responsible." *Cannons Eng'g Corp.*, 899 F.2d at 87. Recouping the economic benefits of noncompliance with the environmental statute is consistent with the substantive fairness requirement.

39.     "Reasonableness" involves the relationship between the relief obtained and the harm that occurred in light of litigation risks. *Id.* at 89-90.

40.     The remaining factor, consistency with public policy, is sometimes described as whether the decree is consistent with the underlying statute's goals. *Id.* at 84; *see also*, *e.g.*, *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1125 (D.C. Cir. 1983).

41.     If the consent decree "comes within the general scope of the case made by the pleadings, furthers the objectives upon which the law is based, and does not violate the statute upon which the complaint was based, the parties' agreement should be entered by the court." *Elec. Controls Design*, 909 F.2d at 1355 (quoting *Local No. 93, Int'l Ass'n of Firefighters, AFL–CIO v. City of Cleveland*, 478 U.S. 501, 525-26 (1986) and *Pacific R.R. v. Ketchum*, 101 U.S. 289, 297 (1879)) (internal quotations omitted).

42.     Once the court enters the consent decree, it becomes an enforceable court order.

**II.     The Miscellaneous Receipts Act**

43.     The Constitution provides that "[n]o money shall be drawn from the treasury, but in consequence of appropriations made by law." Art. I § 9. To prevent the executive branch from augmenting its appropriated budget by diverting funds *before* they ever reach the Treasury, the Miscellaneous Receipts Act requires that "an official or agent of the Government *receiving*

*money* for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b) (emphasis added). *See generally* Todd Peterson, *Protecting the Appropriations Power: Why Congress Should Care About Settlements at the Department of Justice*, 2009 BYU L. Rev. 327, 340 (2009).

44.     One question implicated by the Miscellaneous Receipts Act is whether the government may settle civil enforcement actions by signing a consent decree whereby the defendant promises to disburse funds to a third party.

45.     Since at least 1980, the Office of Legal Counsel ("OLC") has concluded that the government only constructively "receives" money—and therefore violates the Miscellaneous Receipts Act—when it directs funds *otherwise destined* to the Treasury to non-federal accounts. *Effect of 31 U.S.C. § 484 on the Settlement Authority of the Attorney General*, 4B Op. O.L.C. 684, 688 (1980).

46.     Thus, OLC has determined that the United States may not settle environmental enforcement actions by *directing* the violator to fund a non-governmental organization dedicated to wildlife preservation *in lieu of* accepting civil penalties. *Id.* at 688. According to OLC, "the fact that no cash actually touches the palm of a federal official is irrelevant for purposes of [the Miscellaneous Receipt Act], if a federal agency [1] could have accepted possession [of the funds] and [2] retains discretion to direct the use of the money[.]" *Id.*

47.     But by the same token, OLC has "consistently advised" that settlements *do not* violate the Miscellaneous Receipts Act so long as: (1) the settlement is executed before an admission or finding of liability in favor of the United States; and (2) the United States does not retain post-settlement control over the disposition or management of the funds or any projects carried out under the settlement, except for ensuring that the parties comply with the settlement.

*Application of the Gov't Corp. Control Act and the Misc. Receipts Act to the Can. Softwood Lumber Settlement Agreement,* 30 Op. O.L.C. 111, 119 (2006) (citing Mem. for the Files, from Rebecca Arbogast, Attorney-Adviser, O.L.C., *Misc. Receipts Act and Criminal Settlements* (Nov. 18, 1996)). "If these two criteria are met, then the governmental control over settlement funds is so attenuated that the Government cannot be said to be receiving money for the Government." *Id.* at 119 (citation omitted).

**III.      The Administrative Procedure Act**

48.      The Administrative Procedure Act ("APA") allows a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review of that action. 5 U.S.C. §§ 702–704.

49.      Under the APA, a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A) or that are "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C).

**FACTUAL BACKGROUND**

**I.      The History and Success of Supplemental Environmental Projects**

50.      In the 1980s, violators of federal environmental statutes began settling civil enforcement actions by entering into consent decrees that included SEPs. EPA provided a loose definition of these agreements as early as 1984, observing that "[o]ccasions have arisen in enforcement actions where violators have *offered* to make expenditures for environmentally beneficial purposes *above and beyond* expenditures made to comply with *all existing legal requirements*." U.S. EPA, Civil Penalty Policy (July 8, 1980) at 15 (emphasis added).

51.      EPA has continuously refined its policies for SEPs, culminating in its 2015 Guidance. That Guidance defines SEPs as "environmentally beneficial projects which a

defendant agrees to undertake in settlement of an enforcement action, but which the defendant, or any other third party, is not otherwise legally required to perform." U.S. EPA Suppl. Envtl. Projects Policy 2015 Update at 6 (hereinafter "2015 Guidance").

52.     The Guidance explains that "[t]he EPA has broad discretion to settle cases, including the discretion to include SEPs as an appropriate part of a settlement." *Id.* at 7. It then proceeds to lay out "legal guidelines to ensure that SEPs are within the Agency's and a federal court's authority, and do not run afoul of any Constitutional or statutory requirements." *Id.*

53.     The Guidance emphasizes two defining features of SEPs.

54.     ***First***, SEPs are entirely independent from monies paid to the United States Treasury, such as civil penalties.

55.     In environmental enforcement actions, civil penalties both deter future violations and ensure a level playing field for the regulated community. *Id.* at 1. The government will calculate an appropriate penalty based on several considerations, including "the economic benefit associated with the violations, the gravity or seriousness of the violations[,] and the violator's prior history of noncompliance." *Id.* at 21.

56.     The 2015 Guidance states that "SEPs are not penalties, nor are they accepted in lieu of a penalty." *Id.*

57.     To the contrary, "[s]ettlements that include a SEP must always include a settlement penalty that recoups the economic benefit a violator gained from noncompliance with the law, as well as an appropriate gravity [of violation]-based penalty reflecting the environmental and regulatory harm caused by the violation(s)." *Id. See also id.* at 22 (specifying formula for minimum civil penalties in settlements including SEPs).

58.     Like other enforcement considerations, the inclusion of a SEP in a settlement *may* influence a final stipulated penalty: "a violator's commitment to perform a SEP is a relevant factor for the EPA to consider in establishing an appropriate settlement penalty." *Id*. at 21. But the Guidance is clear that SEPs are in no way substitutes for penalties, and there is no mathematical link between SEPs and the quantum of civil penalties.

59.     Specifically, the 2015 Guidance provides that "EPA will consider a variety of factors in determining the amount of penalty mitigation including, but not limited to, the evaluation criteria described in . . . [the] Policy," and that "[p]enalty mitigation in light of a SEP is within the EPA's discretion; there is no presumption as to the correct amount of mitigation." *Id.* at 24.

60.     At most, the "amount of penalty mitigation given for a SEP should be equivalent to *a* percentage of the estimated cost to implement the SEP and should [generally] not *exceed* eighty percent (80%) of that estimated cost." *Id.* (emphasis added). This is an upper bound of a SEP's potential impact on the assessment of an appropriate civil penalty, not a conversion rate.

61.     ***Second***, SEPs are independent from monies already appropriated from the United States Treasury, i.e., they do not "augment" any federal budgets beyond what Congress has appropriated.

62.     The most important of EPA's anti-augmentation devices is its requirement that SEPs possess a "nexus" to the underlying statutory violation, tethering the projects to EPA's statutorily prescribed enforcement authority under the Clean Air Act and other statutes. As EPA explains, "[n]exus ensures the proper exercise of the EPA's prosecutorial discretion and enables appropriate penalty mitigation for including the SEP in the settlement." *Id*. at 7.

63.     To satisfy the nexus requirement, the SEP must, *inter alia*, (1) "advance at least one of the objectives of the environmental statutes that are the basis of the enforcement action," and; (2) reduce the impacts of the alleged violation or the chance that it will occur again. 2015 Guidance at 7-8.

64.     The 2015 Guidance also demands scrutiny of SEPs to ensure that they are not substitutes for appropriated federal activities, an arrangement that would functionally augment the agency's budget by liberating the funds earmarked for those activities. Thus, EPA may not agree to SEPs in which EPA retains any discretion over the project's implementation. *Id.* at 8-9.

65.     EPA must also make reasonable inquiries to ensure that the project does "not provide resources (including, but not limited to, funding, services and/or goods) to perform work on federally-owned property, or provide additional support (including in-kind contributions of goods and services) for a project performed by another federal agency" or by EPA. *Id.* at 9-10. Nor may SEPs substitute for federal financial assistance, such as cooperative agreements. *Id.*

66.     The 2015 Policy, prepared with the assistance of the Office of Legal Counsel, has been described as a "careful and responsible effort[] . . . to ensure that Congress's appropriations prerogatives [are] respected" and "a good example of how the Department of Justice ought to approach the Augmentation Problem . . . so as to honor the Constitution and Congress's proper role in controlling the appropriations process." Peterson, *Protecting the Appropriations Power*, 2009 BYU L. Rev. at 357.[9]

---

[9] Earlier EPA guidance includes analogues of both the nexus requirement and anti-augmentation provisions. *See, e.g.*, U.S. EPA, EPA Policy on the Use of Supplemental Environmental Projects in EPA Settlements (Feb. 12, 1991); Interim Revised EPA Supplemental Environmental Projects Policy, 60 Fed. Reg. 24,856, 24,858 (May 10, 1995); Final EPA Supplemental Environmental Projects Policy, 63 Fed. Reg. 24,796, 24,798-99 (May 5, 1998).

67.     These principles have ensured that SEPs steer well clear of the Miscellaneous Receipts Act while furthering the congressional policies embodied in the Clean Air Act, Clean Water Act, Pollution Prevention Act, and other statutes administered by EPA.

68.     Often referred to as "win-win" devices, SEPs can and have been tailored to protect children's health, drive technological innovation, and mitigate the effects of anthropogenic climate change. 2015 Guidance at 4-6.

69.     During the George W. Bush administration, for example, EPA agreed to SEPs worth roughly $225 million in fifteen settlements with electric power companies, prompting significant new renewable energy generation and pollution control and mitigation. By December of 2011, EPA had entered into seven more such settlements worth nearly $400 million in SEPs.

70.     Among the most important beneficiaries of SEPs are low income and minority communities that disproportionately bear the worst effects of pollution.

71.     The 2015 Guidance explicitly encourages defendants in EPA enforcement actions to "consider SEPs in communities where there are [environmental justice] concerns." The Policy explains that "SEPs can help ensure that residents who spend significant portions of their time in, or depend on food and water sources located near the areas affected by violations will be protected," and situates environmental justice as one of the six criteria used to evaluate SEPs and, separately, civil penalties applied alongside SEPs. 2015 Guidance at 4. *See generally* Patrice L. Simms, *Leveraging Supplemental Environmental Projects: Toward an Integrated Strategy for Empowering Environmental Justice Communities*, 47 Envtl. L. Rep. News & Analysis 10511 (2017).

72.     In 2017, for example, consent decrees included SEPs designed to reduce lead exposure in low income communities in Lima, Ohio, and to install lead-filtering systems in public schools in East Chicago, Indiana.[10]

## II.     The Clark Memorandum

73.     SEPs have also collected a small group of critics. In the late 1980s and early 1990s, for example, the Department of Justice objected to proposed SEPs in citizen suit consent decrees, claiming that SEPs were in fact "penalties" and must be paid to the United States Treasury.

74.     When courts rejected this argument,[11] the Department generally ceased its opposition to SEPs. To the contrary, the Department's Office of Legal Council has blessed settlements like SEPs for decades. *See supra* at 11-12. And in memoranda dated June 5, 2017, January 9, 2018, November 7, 2018, and August 21, 2019, the Department of Justice expressed some skepticism of SEPs as a policy matter, but left open their use in civil settlements.[12] Indeed, the most recent of these memoranda acknowledged the benefits of SEPs. 2019 SEP Memo at 12.

---

[10] U.S. EPA, Annual Environmental Justice Progress Report, 15-16 (2018), https://www.epa.gov/sites/production/files/2019-08/documents/ejprogress_report_fy2018-11.pdf.

[11] *See, e.g., Elec. Controls Design, Inc.*, 909 F.2d at 1355 (9th Cir. 1990) ("While it is clear that a court cannot order a defendant in a citizens' suit to make payments to an organization other than the U.S. treasury, this prohibition does not extend to a settlement agreement whereby the defendant does not admit liability and the court is not ordering non-consensual monetary relief."); *Pa. Envtl. Def. Found. v. Bellefonte Borough*, 718 F. Supp. 431, 436 (M.D. Pa. 1989) (declining to "disapprove a proposed consent decree solely for the reason because [sic] it does not contain a provision requiring the Defendant to pay a civil penalty to the United States").

[12] *See* Mem from Office of the U.S. Att'y Gen., to All Component Heads and U.S. Att'ys Regarding Prohibition on Settlement Payments to Third Parties (June 5, 2017); Mem. from Jeffrey H. Wood, Acting Assistant Att'y Gen., to ENRD Deputy Assistant Att'y Gen. and Section Chiefs re: Settlement Payments to Third Parties in ENRD Cases (Jan. 9, 2018); Mem. from Office of the U.S. Att'y Gen., to Heads of Civil Litigating Components, U.S. Att'ys re: Principles and Procedures for Civil Consent Decrees and Settlement Agreements with State and Local Governmental Entities (Nov. 7, 2018); Mem. from Jeffrey Clark, Assistant Att'y Gen., U.S. Dep't of Just. Env't & Nat. Res. Div., to ENRD Deputy Assistant Att'y Gens. and Chiefs

75.     All the while, courts have continued to approve SEPs as fair, reasonable, and in the public interest.

76.     This history notwithstanding, Assistant Attorney General Clark recently embarked on his own evaluation of SEPs. That expedition bore surprising fruit: "according to [the Assistant Attorney General's] own review and to the research conducted at [his] direction," EPA's SEP policy violates the Miscellaneous Receipts Act. Mem. from Jeffrey Clark, Assistant Att'y Gen., to ENRD Deputy Assistant Att'y Gens. and Section Chiefs re: Supplemental Environmental Projects ("SEPs") in Civil Settlements with Private Defendants at 7 (Mar. 12, 2020).

77.     The Assistant Attorney General's findings are embodied in the March 12, 2020 Clark Memorandum. The Clark Memorandum purports to be an exercise of the Assistant Attorney General's authority to "construe . . . governing sources of law" and to "exercise appropriate prosecutorial discretion." Clark Memorandum at 1.

78.     The Memorandum categorically commands that "attorneys negotiating consent decrees or compromise settlements in EPA cases should not include SEPs in those settlements." Clark Memorandum at 18. It permits no exceptions to this policy. *Id.* at 19.

79.     The Clark Memorandum includes a handful of criticisms of SEPs on policy grounds.

80.     According to the Memorandum, one downside of SEPs is that the projects give insufficient weight to "centuries of [pre-revolutionary] struggle between the [British] Crown and Parliament" over state finances. *Id.* at 17. And in what the Memorandum describes as "*Federalist*

---

of the Envtl. Enf't, Envtl. Def., Envtl. Crimes, Nat. Res., and Wildlife & Marine Res. (Aug. 21, 2019) (hereinafter "2019 SEP Memo").

*Paper 10* terms," it "confidently" concludes (in a footnote) that "SEPs are likely to foment the evil of [political] factions" in the United States. *Id.* at 17 n.20.

81.     The Assistant Attorney General also opines that SEPs make bad policy because they award a windfall to their beneficiaries. In the Memorandum's parlance, these communities—including poor and minority communities disproportionately burdened by pollution—are "vested interest[s]" that are "fortunate enough to be blessed . . .[with] SEP monies." *Id.* at 16.

82.     These musings aside, the Clark Memorandum's only essential rationale is its legal determination that SEPs run afoul of the Miscellaneous Receipts Act. *See, e.g.*, *id.* at 2 (it "is inescapable that SEPs violate the Miscellaneous Receipts Act"); *id.* at 11 ("SEPs violate . . . the Miscellaneous Receipts Act, which is intended to protect Congress' constitutional power of the purse"); *id.* at 19 ("I do not have discretion to make exceptions to what is a sound construction of both statutory and constitutional law.").

83.     Because this reading of the Miscellaneous Receipts Act is legally incorrect—it is baseless and contrary to both the plain text of the Act and decades of Department of Justice interpretations—the Memorandum should be vacated.

84.     The text of the Miscellaneous Receipts Act does not preclude SEPs, since the Act commands the government to transfer "receiv[ed]" funds to the Treasury. 31 U.S.C. § 3302(b). When EPA approves a consent decree including SEPs, funds flow directly from the violator to a judicially approved project, not to the federal government—EPA does not "receive" any funds that could be transferred to the Treasury. The Clark Memorandum concedes as much. Clark Memorandum at 14 ("The money, goods, or services at issue in SEPs never touch the

Treasury[.]"). It also effectively concedes that that SEP funds are not constructively received by the Treasury. *Id*. at 4 n.6.

85.     Instead, the Clark Memorandum contends that SEPs violate the Miscellaneous Receipt's Act's "spirit" in two ways. *Id.* at 11.

86.     ***First***, the Memorandum concludes that SEPs interrupt and divert funds otherwise "destined" for the federal treasury. *Id.* at 12.

87.     Here the Assistant Attorney General gets the timing backwards. SEPs are only permitted prior to a finding of liability—no penalty is guaranteed pending the outcome of the litigation. And prior to settlement, there is no precise and knowable quantum of civil penalties to which the parties will necessarily agree. Rather, EPA begins its assessment of an appropriate settlement by considering numerous non-civil penalty factors, such as the violator's history, the severity of the violation, or voluntary mitigation apart from SEPs. It *then* determines a minimum acceptable civil penalty (based on the economic benefit of noncompliance and the gravity of the violation). 2015 Guidance at 22-24.

88.     EPA therefore does not "forgo[]" "higher penalt[ies]," because those "higher penalt[ies]" never exist in any legally cognizable way. Clark Memorandum at 12. And because the federal government cannot "receiv[e]" funds that do not exist, this process is entirely compatible with the Miscellaneous Receipts Act. 31 U.S.C. § 3302(b).

89.     The Memorandum tacitly concedes that EPA settlement procedures leave the quantum of civil penalties open until the settlement is consummated: Defendants ultimately abandon their theory that funds are "destined" for the Treasury in favor of a novel argument that SEPs are problematic because, unlike the violator's history or other factors influencing the

measure of civil penalties, SEPs represent a *"purposeful* trading of lower monetary penalties for projects not approved by Congress." *Id.* at 14 (emphasis in original).

90.     To the contrary, EPA's guidance clarifies that, for its part, it does not view SEPs as a *quid pro quo*: SEPs are flatly not "accepted in lieu of a penalty." 2015 Guidance at 21.

91.     Grasping for evidence to the contrary, the Memorandum lands on what it deems EPA's "approach" of equating *at least* 80% of an SEP's cost to civil penalties. Clark Memorandum at 14. But the Memorandum conveniently omits EPA's superseding instruction that "[p]enalty mitigation in light of a SEP is within the EPA's discretion; there is no presumption as to the correct amount of mitigation." 2015 Guidance at 24.[13] The "80%" figure is a rough guide, not a mathematical certainty.

92.     Nor does the Memorandum explain why the violator's *expectation* of lower penalties, if it even exists, is a relevant touchstone for determining when funds are constructively *obligated* to the Treasury. To the contrary, the violator's private, subjective estimate of an eventual civil penalty is precisely the type of consideration too "attenuated" to establish constructive receipt of Treasury Funds. 30 Op. O.L.C. at 119.

93.     In short, the "higher penalt[ies]" contemplated by the Clark Memorandum are a fiction. The *only* penalties that exist in SEP settlements are those assessed *after* EPA considers SEPs alongside numerous other potentially mitigating factors. Defendants cannot triangulate higher penalties from the relationship between SEPs and penalties because no such relationship exists. And neither law nor common sense support an inference that money "receiv[ed]" by the

---

[13] Indeed, in at least one recent enforcement action, DOJ removed a proposed SEP but *did not* proportionately increase the defendant's civil penalty. *See generally* Hiroko Tabuchi*, U.S. Reopens Harley Settlement, Cutting Funds for Pollution Reduction Plan*, N.Y. Times (July 20, 2017), https://www.nytimes.com/2017/07/20/business/us-reduces-harleys-fine-meant-to-cut-air-pollution.html.

executive branch, 31 U.S.C. § 3302(b), should be measured by what a defendant silently guesses it may or may not someday transfer to the federal government. "Predestination" is a foreign concept to SEPs.

94.     **Second**, the Clark Memorandum protests that SEPs constitute the type of budgetary augmentation that the Miscellaneous Receipts Act was designed to arrest. *See* 30 Op. O.L.C. at 119 (warning against settlements retaining an agency's "discretion to direct the use of settlement money").

95.     This argument rests on the inaccurate conclusion that SEPs are discretionary funding decisions by EPA. According to the Memorandum, EPA "direct[s] the use of . . . money by requiring through the settlement agreement that . . . funds be spent" on qualifying projects. Clark Memorandum at 12.

96.     Of course, it is the approval of an agreement by a federal court, not a federal agency, that "requires" compliance with a consent decree and expenditure of SEP funds. In any event, the Memorandum's assertion is untenable in light of EPA's explicit prohibition on the agency's post-settlement discretion over SEPs and the agency's understanding that SEPs are "proposed" by defendants, not directed by EPA. *See, e.g.*, 2015 Guidance at 2, 8 n.10, 9 n.11, 20.

97.     With that argument off the table, the Clark Memorandum moves on to contend that the *effect* of SEPs is to augment the executive's budget. But the Memorandum does not contend that SEPs actually replace any appropriated projects or free otherwise appropriated funds. Nor could it: EPA's policy unambiguously requires that SEPs are independent from any other project or action across the entire executive branch.

98.     Instead, the Memorandum hypothesizes that SEPs must be offensive to Congress: the Memorandum argues that SEPs facilitate "the payment of money or in-kind good or services

to a third-party for activities that Congress either intentionally funded to a specific level, intentionally declined to fund, or simply had no occasion to consider[.]" Clark Memorandum at 14.

99.     Even if accurate, this argument makes no effort to explain why the Miscellaneous Receipts Act, which applies only to "receipt" of funds, would operate to preclude SEPs.

100.     In any event, the argument cannot withstand EPA's nexus requirement, which tethers SEPs to the statutory violations and enforcement explicitly contemplated by Congress. *Cf. Local No. 93*, 478 U.S. at 525 ("a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial").

101.     Indeed, the Memorandum is replete with concessions to this effect: according to the Memorandum, the nexus requirement "ensures that SEPs have at least some conceptual connection to the violations at issue[,]" "alleviate[s] the most obvious and egregious difficulties that SEPs present," and is consistent with the "legal view" of Comptroller General. Clark Memorandum at 12. The Memorandum's only counterargument is a conclusory statement that "in [some] cases, the nexus requirement itself creates tension with anti-augmentation principle[.]" *Id.* Whatever the force of this argument—the Memorandum provides no elaboration or pertinent examples—it has nothing to do with the text of the Miscellaneous Receipts Act or the lawfulness of SEPs.

102.     Ultimately, the legal analysis in the Clark Memorandum is at least as notable for what it omits as for what it includes. It does not grapple with two decades of Department of Justice policy, still on the books, that blesses EPA's SEP policy. Nor does it seriously acknowledge the factual and legal conclusions incorporated in detailed guidance documents that

EPA *and* DOJ have deployed to ensure that SEPs avoid even the appearance of violating the Miscellaneous Receipts Act and its underlying policy considerations.

103.    The Memorandum makes no effort to explain why, if SEPs indeed "contravene long-established principles prohibiting the diversion of funds away from the treasury," *id.* at 11, hundreds of district courts and thousands of attorneys have, for two decades, concluded that they are fair, reasonable, and in the public interest. And despite SEPs' lengthy history, the Memorandum provides not one example of a project that ostensibly violates the Miscellaneous Receipts Act or even general principles of anti-augmentation.

104.    These omissions underscore that the Clark Memorandum is an arbitrary, extra-legal reading of the Miscellaneous Receipts Act.

105.    The Clark Memorandum will undo four decades of progress in enforcing federal environmental statutes, and will markedly trim available relief to communities suffering the effects of environmental pollution. Poor and minority communities—those whom the Assistant Attorney General considers inappropriately "blessed" by SEPs—will bear the brunt of these effects, which the Memorandum ignores.

106.    Worse, the Assistant Attorney General appears to interpret his memorandum as applying not only to ENRD, but also to EPA. In recent remarks, the Assistant Attorney General has indicated that he expects EPA to implement his memorandum for that agency's *administrative* enforcement actions, extending the memorandum's reach to a far larger galaxy of cases and potential SEPs.[14]

---

[14] *Capital Conversations: The Limits of EPA Authority: Supplemental Environmental Projects*, The Federalist Society (Mar. 27, 2020), found at https://fedsoc.org/events/capital-conversations-jeffrey-clark-assistant-attorney-general-environment-and-natural-resources-division-enrd-department-of-justice.

107.    Indeed, in response to the original Complaint in this matter, Deputy Assistant Attorney General Jonathan Brightbill represented that "EPA . . . has adopted the Department's position in its approach to its own administrative settlements."[15]

108.    EPA has not publicly released the rule identified by Deputy Assistant Attorney General Brightbill.

109.    Defendants' extension of the Clark Memorandum to EPA's administrative actions will further stymie congressional intent, rendering the nation more polluted and less safe.

## III.    The Clark Memorandum Injures Plaintiffs

110.    Plaintiffs bring this action on behalf of their members. Plaintiff CLF also brings this action on its own behalf.

111.    CLF members regularly use and enjoy areas of New England that have benefitted from SEPs obtained by DOJ in environmental enforcement litigation and by EPA in its administrative settlements.

112.    CLF members' use and enjoyment of these areas have been directly improved by the environmental benefits of relevant SEPs. In particular, CLF members have benefitted from the numerous SEPs that have improved the environment in and around the Boston area. Since 2005, DOJ has agreed to at least nine such SEPs, totaling approximately $8 million in costs to polluters, with a likely larger monetized benefit to the communities who benefit from the projects.

113.    These projects include, for example, a SEP agreed to in a settlement with Clean Harbors of Braintree stemming from hazardous waste pollution. The SEP required planting of 800 trees in environmental justice areas of Boston and supported the purchase of an aerial

---

[15] Pamela King, *Greens due DOJ for ditching popular enforcement tool*, E&E News (Oct. 8, 2020), https://www.eenews.net/eenewspm/2020/10/08/stories/1063715843.

platform fire truck for Braintree. In 2015, DOJ approved a SEP requiring the Massachusetts Bay

Transit Authority's commuter lines to switch to low sulfur fuel, at a cost of $1 million. And in

2012, the Department approved a settlement under which Sterling Suffolk Racecourse allocated

over $700,000 to monitoring local watersheds and facilitating access to marshes near Boston

Harbor.

114.    SEPs outside the Boston area but within CLF's footprint include projects that

replaced harmful, wood burning stoves, protect wetlands, and safeguard watersheds by reducing

stormwater runoff.

115.    The need for environmental remediation and protections via SEPs will continue in

the Boston area and throughout New England, but the Clark Memorandum prevents this need

from being fully met.

116.    In particular, urban areas of New England are subject to the worst air and water

pollution in the region. Rivers, streams, and lakes suffer from commercial, municipal, and

industrial pollution, specifically phosphorus and nitrogen pollution and associated increases in

harmful blue-green algae.[16] SEPs have been effective tools to remediate pollution of urban

waterways, but will no longer be available through DOJ enforcement actions.

117.    Likewise, areas of Massachusetts have some of the highest incidences of asthma

in the United States (in particular, Springfield and Holyoke, and certain marginalized

---

[16] *See* Mystic River Watershed, EPA, https://www.epa.gov/mysticriver/about-mystic-river-watershed#:~:text=The%20Mystic%20River%2C%20which%20flows,urban%20rivers%20of%20New%20England.

communities in Boston).[17] Increasing levels of air pollution will exacerbate these respiratory issues.

118.    SEPs have been effective tools to remediate air pollution violations in these areas. For example, EPA and DOJ settled the aforementioned Clean Air Act litigation against the Massachusetts Bay Transportation Authority for illegal train idling, including a $1 million SEP reducing air pollution from high sulfur fuels.

119.    According to EPA's ECHO database, there are well over three thousand facilities in CLF's footprint that are noncompliant with environmental laws administered by EPA. There are 145 such facilities in Rhode Island alone, 119 in Middlesex County, Massachusetts, and 115 in Hartford County, Connecticut. In New Haven, Connecticut, EPA lists seven facilities that are in violation of the Clean Water Act. In Boston, that number is 22.

120.    Similarly, Surfrider's members have benefited from SEPs along U.S. coastlines and shorelines, including in and around Chicago. Surfrider has members who frequently surf and/or recreate on the beaches of Lake Michigan, including near Chicago and Gary, Indiana. Surfrider members frequently surf in Whiting, Indiana, between the mouth of the Calumet River and Indiana Harbor. Some of the most popular regional surf spots are approximately two to three miles of open water west of the harbor mouth, and include Whihala Beach, "the Shoe" (in front of Horseshoe Casino), and "Shooters." Some members also surf at "Casinos" in East Chicago, just east of Indiana Harbor.

---

[17] Mass. Dep't of Public Health, Prevalence of Asthma Among Adults and Children in Massachusetts (2017), https://www.mass.gov/files/documents/2018/05/09/burden-in-mass.pdf; Asthma and Allergy Foundation of America, Asthma Capitals: The Most Challenging Places to Live with Asthma (2019), https://www.aafa.org/media/2420/aafa-2019-asthma-capitals-report.pdf.

121.    These areas routinely suffer from air and water pollution caused by the hundreds of industrial facilities in the region. For example, EPA-approved studies have shown that local sources of airborne mercury emissions in Chicago and Gary led to significantly higher concentrations of mercury across the "entire Lake Michigan basin," particularly along the shoreline frequented by Surfrider's members.[18] The link between mercury emissions and neurotoxicity in wildlife (including the Great Lakes' freshwater fish and birds) is well established. Surfrider's members routinely suffer from foul smelling and tasting water when surfing in these areas, describing odors akin to gasoline or soap. The members have also suffered from ailments including rashes and blurry and bloodshot eyes after surfing.

122.    In the last 15 years, Defendants have used SEPs to secure environmentally beneficial projects costing tens of millions of dollars, with benefits likely worth more. Many of these projects have directly benefited the areas where Surfrider's members live and recreate. This includes hundreds of thousands of dollars designated to clean up the heavily industrialized Grand Calumet River, which flows through Gary and discharges into Lake Michigan via the Indiana Harbor and Ship Canal.[19] DOJ has also used SEPs to secure millions of dollars' worth of mercury reductions in the region,[20] and, according to EPA's ECHO Database, has entered into roughly a half dozen SEPs since 2005 reducing localized air pollution.

123.    Given these ongoing public health challenges, future federal enforcement actions and SEPs would, in the ordinary course, benefit Plaintiffs by reducing pollution or curbing some

---

[18] Matthew Landis et al., *Atmospheric Mercury in the Lake Michigan Basin: Influence of the Chicago/Gary Urban Area*, 36 Envtl. Sci. & Tech. 21, (2002).
[19] Notice of Lodging of Proposed Consent Decree Under the Clean Water Act, 81 Fed. Reg. 92854 (Dec. 12, 2016).
[20] Notice of Lodging of Consent Decree Between the United States and Illinois Power Company and Dynegy Midwest Generation Under the Clean Air Act,  70 Fed. Reg. 12898 (Mar. 16, 2005).

of the pollution's worse effects. The Clark Memorandum's prohibition on SEPs in future settlements of federal environmental enforcement litigation forecloses these possibilities, impairing Plaintiffs' members' capacity to use and enjoy natural places in the Chicago and Boston areas and in New England, and to avoid the worst health and economic injuries from unchecked local pollution. Simply put, the Clark Memorandum reduces the anticipated continued SEP benefits for Plaintiffs' members to *zero*.

124.     The Clark Memorandum therefore injures Plaintiffs' memberships' legally protected and cognizable aesthetic and recreational interests.

125.     CLF members that use and enjoy urban waterways in New England will be harmed by the Clark Memorandum's elimination of SEPs as an enforcement tool, as will CLF members who depend on SEPs to ameliorate air pollution in New England. Likewise, Surfrider's members will suffer from higher localized air and water pollution in the areas where they surf, including on the Lake Michigan shoreline between Chicago and Gary.

126.     Because EPA has adopted the Clark Memorandum for its administrative settlements, injuries to Plaintiffs' memberships will be significantly worse than if adoption was limited to the Department of Justice. Since 2010, EPA has approved 13 administrative SEPs in the Chicago and Gary region for violations of the Clean Air Act and Clean Water Act. And in 2010, EPA approved an administrative SEP requiring Winthrop, Massachusetts, to purchase 300 rainwater harvesting systems to reduce pollutant transport through infiltration. Future administrative SEPs are flatly unavailable under EPA's adoption of the Clark Memorandum, foreclosing these and related benefits to Plaintiffs' members despite the ongoing threat of local pollution.

127.    CLF is also injured in its own right by the Clark Memorandum, and, in particular, will suffer injuries to its legally protected interests in its own operations and its capacity to seek a full suite of legal remedies under the Clean Water Act, Clean Water Act and other statutes.

128.    CLF previously has brought numerous enforcement actions against polluters in New England. CLF views SEPs as essential tools to remediate air and water pollution, and as particularly valuable in its efforts to advance environmental justice by focusing environmental restoration projects in communities most impacted by pollution. It will not settle a case without including them.

129.    CLF's enforcement actions include numerous Clean Air Act lawsuits against bus and truck fleets engaged in illegal idling. Tailpipe pollution from idling is a leading contributor to bad air quality in its communities, disproportionately in communities of color. It has been linked to health problems such as asthma, lung cancer, emphysema, and heart disease, and children are especially vulnerable.

130.    CLF has also undertaken significant enforcement work responding to pollution in New England's waters. In addition to work related to the Mystic River, CLF has filed more than 45 Clean Water Act citizen suits to protect waters in New England against unpermitted industrial polluters. These suits have generated more than $320,000 in SEP payments to support cleanup and remediation of the waterways.

131.    CLF also has a significant litigation project combating the degradation of Cape Cod's bays, lakes, and ponds, which has resulted in multiple SEPs to fund restoration efforts.

132.    In total, CLF has obtained more than $2,000,000 in SEP funding for local environmental protection and restoration projects across New England as a result of its environment enforcement.

133.     DOJ's decision to forsake SEPs in enforcement actions will require CLF to modify its strategies and undertake additional citizen suits.[21] Previously, CLF could expect the DOJ enforcement actions in New England to include SEPs, and accordingly, could rely on federal enforcement to have beneficial effects on a wide range of local environmental issues. CLF did not need to bring enforcement cases to stop those violations and restore air or water quality. Now that potential federal enforcement will include no locally beneficial SEPs, CLF must engage in additional work to make up for the lack of environmentally beneficial projects.

134.     CLF's anticipated increased work in response to the Clark Memorandum will include, among other drains on CLF's resources, additional civil litigation to enforce the Clean Water Act and Clean Air Act, additional comments on proposed permits under those acts, and petitions for EPA to require Clean Water Act permits for stormwater discharge (known as "RDA permits"). Because CLF has limited resources with which to pursue its full suite of conservation programs, this new focus of its work will directly impair CLF's ability to pursue its normal activities. In particular, the drain on staff time will limit CLF's ability to bring other environmental enforcement lawsuits.

## CLAIMS FOR RELIEF

### Count One
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)
### (Against Defendants Barr, Clark, and DOJ)

135.     Plaintiffs repeat and incorporate by reference each of the forgoing allegations as if fully set forth herein.

---

[21] In recent litigation, the Department has vigorously opposed settlement agreements between polluters and private parties even where remedial environmental projects did not take the form of SEPs. *See United States v. DTE Energy Co.*, No. 10-cv-13101 (E.D. Mich.), ECF No. 279 at 11-22 (July 8, 2020).

136.     The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

137.     The Clark Memorandum is final agency action. 5 U.S.C. § 704. The Memorandum represents Assistant Attorney General Clark's final word on the legality of SEPs, *see* Clark Memorandum at 18-19, and gives rise to direct and appreciable legal consequences by precluding EPA and Defendants from approving SEPs and their associated environmental benefits in judicial actions.

138.     The Clark Memorandum's indispensable rationale is its legal conclusion that SEPs violate the Miscellaneous Receipts Act.

139.     That conclusion is arbitrary, capricious, an abuse of discretion, and not in accordance with law. The Memorandum concedes that SEPs do not violate the text of the Miscellaneous Receipts Act, and its arguments concerning the Act's "spirit" distort the statute, EPA's 2015 Guidance, and the Department's understanding of constructive receipt beyond all recognition.

140.     The remainder of the Memorandum's analysis is arbitrary and capricious because it lacks reasoned decision-making. *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29 (1983).

### Count Two
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)
### (Against Defendants Wheeler and EPA)

141.     Plaintiffs repeat and incorporate by reference each of the forgoing allegations as if fully set forth herein.

142.    According to Deputy Assistant Attorney General Brightbill, EPA has adopted the Clark Memorandum in its approach to its administrative settlements, meaning that EPA may not use SEPs in those settlements. EPA has not released the order by which it has adopted the Clark Memorandum.

143.    The EPA's adoption of the memorandum is final agency action. 5 U.S.C. § 704. On information and belief (and as indicated by Deputy Assistant Attorney General Brightbill), EPA's order represents the agency's final word on the legality of SEPs in administrative settlements and gives rise to direct and appreciable legal consequences by precluding EPA from approving SEPs and their associated environmental benefits.

144.    EPA's action is arbitrary and capricious because, by adopting the Clark Memorandum, it also adopts the Memorandum's incorrect reading of the Miscellaneous Receipts Act and its overall lack of reasoned decision-making.

## **Prayer for Relief**

WHEREFORE, Plaintiffs pray that this Court:

1.    declare that the Clark Memorandum and the EPA rule adopting the Memorandum violate the APA and are therefore unlawful;

2.    vacate the Clark Memorandum and EPA's adoption thereof and enjoin Defendants from implementing or relying on the Memorandum in any way;

3.    award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

4.    grant any other relief this Court deems appropriate.


Dated: December 15, 2020              Respectfully submitted,

                                      */s/ Travis Annatoyn*
                                      Travis Annatoyn (admitted *pro hac vice*)

34

Robin Thurston (admitted *pro hac vice*)
Michael Martinez (admitted *pro hac vice*)
Sean Lev (admitted *pro hac vice*)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
rthurston@democracyforward.org
mmartinez@democracyforward.org
tannatoyn@democracyforward.org
slev@democracyforward.org

Heather A. Govern, MA Bar No. 686281
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
(617) 850-1765
hgovern@clf.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that this document was filed through the Court's ECF system, which will cause copies to be sent to all counsel of record.

Dated: December 15, 2020

*/s/ Travis Annatoyn*
TRAVIS ANNATOYN