# EXHIBIT 1



U.S. Department of Justice
Environment and Natural Resources Division

*Assistant Attorney General*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530-0001*

*Telephone (202) 514-2701*

TO:        ENRD Deputy Assistant Attorney Generals and Section Chiefs

FROM:      Jeffrey Bossert Clark, Assistant Attorney General *JBC*

SUBJECT:   Supplemental Environmental Projects ("SEPs") in Civil Settlements with Private Defendants

DATE:      March 12, 2020

    This Memorandum is issued as an exercise of my authority both (1) to construe the governing sources of law as a necessary part of ensuring any and all enforcement actions I authorize and every position taken in court in cases that I supervise comport with the law; *and* (2) to exercise appropriate prosecutorial discretion as to both civil and criminal enforcement cases.[1]

    The Miscellaneous Receipts Act, 31 U.S.C. § 3302, requires any federal officer receiving funds on behalf of the United States to deposit them in the Treasury. That allows Congress to decide how to appropriate those dollars under its constitutional authority. Civil penalties are "money for the Government" within the meaning of the Miscellaneous Receipts Act. Attempts in consent decrees and settlement agreements to divert cash from the Treasury to third parties have long been deemed improper and inconsistent with the Miscellaneous Receipts Act, absent authorization from Congress. In addition to and distinct from their inconsistency with the law, such practices also constitute improper policy, in that they allocate budgetary discretion to officials who are not specifically designated to make such decisions. Indeed, any payment to non-victim third parties required by a settlement, even without the reduction of penalties, raises concerns.

    Some agencies (including the Environmental Protection Agency (EPA), working with the Justice Department prior to the issuance of this Memorandum), have entered into settlements that require defendants to expend funds to provide goods or services to third parties in lieu of the payment of penalties. This practice has been denominated Supplemental Environmental Projects or "SEPs" for short. These agencies and the Department have relied on the rationale that SEPs do not trade penalties for projects because there is no penalty owed to the government until the

---

[1] This memorandum is intended to govern the staff of the United States Department of Justice, Environment and Natural Resources Division, in their handling of enforcement actions. It is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity against the United States, its departments, agencies, entities, officers, employees, or agents, or any other person.

settlement is finalized.[2]  While these agencies and the Department have relied in good faith on this rationale, it has been controversial for decades, and it does not provide a basis for including such provisions moving forward. These in-kind payments in exchange for a reduction of a penalty are as problematic as direct cash payments to third parties.  Indeed, the policy on which EPA and the Department previously relied to justify these payments recognizes that a given SEP can result in direct penalty mitigation of 80% (or less).[3]  In other words, all things being equal, if a defendant agrees to perform a $1 million SEP, it can reduce its civil penalties by $800 thousand (or less).[4] In effect, this represents a "conversion rate" for SEPs into civil penalties.  Given this acknowledged mathematical relationship between penalties and SEPs, the conclusion is inescapable that SEPs violate the Miscellaneous Receipts Act.  Moving forward, they therefore will no longer be part of the suite of relief the Environment and Natural Resources Division seeks in its cases (unless specifically authorized by Congress), both in light of their inconsistency with law and their departure from sound enforcement practices.[5]

---

[2] *See Application of the Government Corporation Control Act and the Miscellaneous Receipts Act to the Canadian Softwood Lumber Settlement Agreement,* 30 Op. O.L.C. 111, 119 (2006) (noting that "[t]o avoid the government's constructively "receiving money for the Government" through a settlement, we have consistently advised that (1) the settlement be executed before an admission or finding of liability in favor of the United States; and (2) the United States not retain post-settlement control over the disposition or management of the funds or any projects carried out under the settlement, except for ensuring that the parties comply with the settlement."), *available at*  https://www.justice.gov/olc/file/477041/download.

[3]  *See* U.S. Environmental Protection Agency Supplemental Environmental Projects Policy 2015 Update, at 23-24 (Mar. 10, 2015) ("2015 SEP Policy"), *available at* https://www.epa.gov/sites/production/files/2015-04/documents/sepupdatedpolicy15.pdf.  This document provides that, in order to qualify to perform a SEP, the defendant must also agree to pay *some* amount of civil penalties.  *See id.* at 21.  That is, of course, preferable to a situation in which *all* civil penalties that should be sought in a particular case are converted into SEPs, but this quite modest restriction (to the extent observed, *infra* n.4) does not answer for the full slate of legal issues that SEPs raise.

[4]  Subject to the floor on seeking civil penalties described in the immediately prior footnote, *see* 2015 SEP Policy at 21, there are even limited circumstances where SEPs could achieve 100% interoperability with dollars of civil penalties, *see* 2015 SEP Policy at 24, *i.e.*, situations where monies spent on SEPs are remarkably credited *dollar-for-dollar* for civil penalties being offset.

[5] This Memorandum does not apply retroactively.  While the legal conclusions reached herein are solidly grounded, I do not question the personal motivation of individuals that were acting under previously adopted SEP policy when settling violations of environmental statutes.  Nor does this Memorandum question the legitimacy of past settlements or suggest that oversight of SEPs being carried out under *existing* settlements is improper.  Further, this Memorandum does not require the reopening of settlements that already have been signed or approved by Department or agency officials.  SEPs should have been consistently avoided in the past, but the point of this Memorandum is to get the law right, and the enforcement practices aligned with it, on a forward-looking basis.

**BACKGROUND**

    **A.**    **Congress' Exclusive Power of the Purse**

The Constitution gives Congress exclusive authority to determine how to spend funds deposited in the Treasury. *See* Article I, Section 8 Clause 1 (Taxing and Spending Clause); Article I, Section 9, Clause 7 (Appropriations Clause). The "power of the purse" is a well-settled component of separation of powers. To protect this power against intrusion from the Executive Branch, Congress has enacted such statutes as the Miscellaneous Receipts Act and Antideficiency Act. *See generally* Todd David Peterson, *Protecting The Appropriations Power: Why Congress Should Care About Settlements at the Department of Justice*, 2009 B.Y.U. L REV. 327, 332-52 (2009) (explaining how Executive attempts to evade Congress' appropriations authority led Congress to enact the Miscellaneous Receipts Act and the Antideficiency Act). The Miscellaneous Receipts Act provides that government officials "receiving money for the Government from any source shall deposit that money with the Treasury." 31 U.S.C. § 3302(b). The Antideficiency Act prohibits government officials from expending funds (or incurring financial obligations) in excess of appropriations. 31 U.S.C. § 1341; *see also* 31 U.S.C. §1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.").

    **B.**    **The Settlement Authority of the Attorney General**

The Attorney General has broad discretion when settling litigation involving the United States, including discretion to agree to terms that a court would not have the power to order. *See The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47 (1982), available at https://www.justice.gov/sites/default/files/olc/opinions/1982/01/31/op-olc-v006-p0047.pdf. Although broad, this discretion is not without limit. Even the Attorney General cannot structure a settlement on considerations or terms that are unconstitutional or inconsistent with an Act of Congress. *See Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.L.C. 136, 140 (1999), *available at* https://www.justice.gov/file/19516/download ("the Moss Memo"). Outside such limits, the Attorney General possesses authority to settle litigation on such terms as he determines would be in the best interests of the United States. *Id.* at 136-37. But the considerations and terms that inform and structure a settlement still must be traceable to a discernible source of authority. *Id.* Considerations such as litigation risk are inherent in the settlement power itself. Policy considerations, however, must be rooted in the purposes of the statutes that govern the agency vested by Congress with some sphere of policymaking discretion and on whose behalf the settlement would be effectuated. 23 Op. O.L.C. at 138. To be sure, such "purposes" can be understood broadly or narrowly. To protect and promote such essential constitutional values as separation of powers and Congress' power of the purse in the context of SEPs, we must construe these purposes narrowly.

One clear limit on the Attorney General's settlement authority is found in the Miscellaneous Receipts Act. In 1980, the Office of Legal Counsel (OLC) issued an opinion concluding that a proposed settlement in *In re Complaint of Steuart Transportation Co.* (E.D. Va. No 76-697-N) violated 31 U.S.C. § 484, which (as a predecessor statute to the Miscellaneous Receipts Act) required all money received for the use of the United States be deposited in the

Treasury.  *See Effect of 31 U.S.C. § 484 on the Settlement Authority of the Attorney General*, 4B Op. O.L.C 684, 684-85 (1980), *available at* https://www.justice.gov/olc/opinions?f%5B0%5D= field_opinion_post_date%3A1980&f%5B1%5D=field_opinion_post_date%3A1980-06.  OLC opined that the requirements of Section 484 must be strictly applied, noting that the Government Accountability Office (GAO) finds exceptions to the application of that statute "only when supported by a clear expression of congressional intent." *Id.* at 686-87.

Under the terms of the proposed settlement in *Steuart,* the state and federal governments would have shared entitlement to monetary damages for the death of waterfowl, which would be donated by the defendant to a waterfowl organization.  *Id.* at 685.  In its opinion, OLC offered theories for amending the settlement or defending the settlement as proposed, including a theory that under the terms of the proposed settlement no money was received.  *Id.* at 687.  But OLC rejected the no-money-received theory, finding it insufficient to override the legislative mandate of Section 484, stating that "the fact that no cash actually touches the palm of a federal official is irrelevant for purposes of § 484, if a federal agency *could have accepted possession* and retains discretion to direct the use of the money."  *Id*. at 688 (emphasis added).  OLC concluded that "money available to the United States and directed to another recipient is constructively 'received' for the purposes of § 484."  *Id.*[6]  OLC therefore concluded the statute barred the proposed settlement.  *Id.*

In 1983, the Comptroller General addressed a proposed policy of the Commodities Futures Trading Commission (CFTC), which would have allowed the CFTC to accept a charged party's promise to make a donation to an educational institution as part of a settlement agreement.  *See* 1983 Comp. Gen. Op at *1.[7]  The CFTC contended that such a practice comported with its broad prosecutorial powers.  *Id.*  Although the Comptroller General agreed "that settlements may contain terms and undertakings that go beyond the remedies specifically given the Commission," he disagreed that prosecutorial discretion extends to remedies unrelated to correction of the identified violation.  *Id.* at *2.

The CFTC also argued the proposed settlement did not violate the Miscellaneous Receipts Act because it would never actually "receive" the donated money.  *Id.* at *1.  The Comptroller

---

[6] OLC later opined that the government is not in constructive receipt of settlement monies directed to non-government parties when two criteria are satisfied: (1) the settlement is executed before an admission or finding of liability; and (2) the United States does not retain post-settlement control over the disposition or management of the funds or any projects carried out under the settlement, except for ensuring that the parties comply with the settlement. *See* Application of the Government Corporation Control Act and the Miscellaneous Receipts Act to the Canadian Softwood Lumber Settlement Agreement, 30 Op. OLC 111, 119, *supra* n. 2.  As will be explained *infra*, the problem with SEPs is not solely that they create a constructive receipts problem, but also that they trade civil penalties destined for the Treasury for projects selected by Executive Branch officials.

[7] *Matter of: Commodities Futures Trading Commission – Donations under Settlement Agreements*, B-210210, 1983 WL 197623 (Comp. Gen. Sept. 14, 1983).  Although OLC has determined that Comptroller General opinions are not binding on DOJ, they are certainly instructive, particularly where they reiterate conclusions reached elsewhere.  *See* Memorandum for Emily C. Hewitt, General Counsel, General Services Administration from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel (August 11, 1997).

disagreed, concluding that the CFTC's authority to agree to money-based sanctions is statutorily limited to civil penalties, which must be collected by the CTFC and paid as miscellaneous receipts into the Treasury. *Id.* at *2. The Comptroller stated that "[t]he Commission may not circumvent the receipt of a penalty to accomplish a separate objective." *Id.*

In 1990, the Comptroller General issued a similar opinion concerning a Nuclear Regulatory Commission (NRC) policy that permitted charged licensees to fund nuclear safety research projects in lieu of paying monetary civil penalties. *See* 1990 Comp. Gen. Op at **1.[8] Although Congress provided the Commission with the statutory authority to "compromise, mitigate, or remit" civil penalties, the Comptroller nonetheless found NRC's policy to be objectionable because the donations were not truly compromising or mitigating the harm caused by the violation. *Id.* at **2. "Under NRC's proposal, a violator would contribute funds to an institution that, in all likelihood, has no relationship to the violation and has suffered no injury from the violation." *Id*. Moreover, the Comptroller found it unreasonable to assume that Congress intended to allow NRC to augment its appropriations for nuclear safety research projects through compromises or mitigation in settlement agreements. *Id*. at **2-**3.

\* \* \*

In sum, the Attorney General has broad authority to settle matters, but that authority is not unlimited. For example, in resolving an enforcement action for a violation of federal law, the Division as the Attorney General's delegate cannot agree to remedies not specified in the governing statute(s) that have no direct and specific relation to the underlying violation. The Division also cannot, as another example, trade monetary penalties payable to the Treasury for the funding of causes or undertakings the Division deems worthwhile.

### C.     **Supplemental Environmental Projects (SEPs)**

The Attorney General's settlement authority is especially pertinent to the Division's work. Most enforcement actions for failure to comply with the environmental laws are resolved through settlement agreements or consent decrees. Those settlements or decrees usually stipulate the penalty amount. EPA determines its view of the appropriate amount of the final settlement penalty by considering many factors, including whether the alleged violator has agreed to perform SEPs. *See* 2015 SEP Policy at 6, 21-24. The Department of Justice next considers the views of its relevant client agency, such as EPA, and then decides how to proceed when negotiating the settlement of litigation in the courts.

As EPA defines it, a SEP is "an environmentally beneficial project or activity that is not required by law, but that a defendant agrees to undertake as part of the settlement of an enforcement action." *Id*. at 1. In exchange for a defendant's voluntary commitment to perform a SEP as part of a settlement, EPA seeks a lesser civil monetary penalty in the settlement than what the agency would otherwise seek. *Id*. at 1, 6, 21-24. As noted above, EPA takes the position that "[t]he amount of penalty mitigation given for a SEP should be equivalent to a percentage of the estimated cost to implement the SEP and should not exceed eighty percent (80%) of that estimated cost." 2015 SEP Policy at 24.

---

[8] *Matter of: Nuclear Regulatory Commission's Authority to Mitigate Civil Penalties*, B-238419, 1990 WL 293769 (Comp. Gen. Oct. 9, 1990).

The origin of SEPs is not perfectly clear. EPA has been including SEP-like provisions in settlement agreements since about 1980. *See* 1992 Comp. Gen. Op. at *1 (noting that EPA developed its Clean Air Act "alternative payment" policy in 1980).[9] Two EPA policy documents from 1984 discuss the factors for the agency to consider when adjusting its initial penalty target during settlement negotiations, including whether there are any agreed on "alternative payments."[10] The policy describes "alternative payments" as environmentally beneficial expenditures for activities that the alleged violator is not otherwise obligated to perform or could be reasonably expected to perform in the normal course of business. The policy lists conditions for the acceptance of an alternative payment plan, most of which seek to ensure that the violator receives just punishment for its violation. But one condition prohibits EPA from holding any funds unless the relevant statute specifically provides that authority.

EPA issued its first official SEP policy in 1991. This policy has been controversial since its inception. In 1992, the Comptroller General addressed whether EPA had authority to enter into settlement agreements that would allow alleged violators of the Clean Air Act to perform SEPs in exchange for (*i.e.*, in a *de facto* or *de jure quid pro quo*) reduction in civil penalties. EPA contended that Congress approved of SEPs in the 1990 Clean Air Act amendments by providing EPA with the power to "compromise or remit, with or without conditions" administrative penalties. *See* 1992 Comp. Gen. Op at *1-*2. Analogizing this situation to the earlier requests of the CFTC and NRC, the Comptroller General concluded that EPA lacked the statutory authority to enter into the settlement agreement with the proposed SEPs. *Id.* at *3-*4.[11]

Believing that the Comptroller General mistakenly had overlooked its 1991 SEP policy, which required any SEP to have a sufficient "nexus" to the violation and prohibited EPA from accepting any SEP in the form of a monetary "payment," EPA asked the Comptroller to reconsider his decision. But the Comptroller declined, noting that the majority of SEPs in EPA settlements have been used to fund public awareness projects that "go beyond remedying the violation to carry out other statutory goals of the agency," thereby permitting "the agency to improperly augment its appropriations for . . . other purposes, in circumvention of the congressional appropriations process." 1993 Comp. Gen. Op. at *1.[12] The Comptroller further rejected EPA's argument that

---

[9] *Letter to the Honorable John D. Dingell, Chairman, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House of Representatives*, B-247155, 1992 WL 726317 (Comp. Gen. July 7, 1992).

[10] GM-21, *Policy on Civil Penalties* (Feb. 16, 1984); and GM-22, *A Framework for Statute-Specific Approaches to Penalty Assessments: Implementing EPA's Policy on Civil Penalties* (Feb. 16, 1984), *available at* https://www.epa.gov/sites/production/files/documents/epapolicy-civilpenalties021684.pdf.

[11] EPA further argued that Congress had ratified its SEP policy by permitting EPA to continue to issue notices of violations and settle certain matters. *See* 1992 Comp. Gen. Op. at *3-*4. The Comptroller General rejected that argument, finding no clear statement in the 1990 Clean Water Act amendments (or its legislative history) that Congress knew about EPA's SEP policy, let alone ratified use of such a remedial device. *Id.*

[12] *See Letter to the Honorable John D. Dingell, Chairman, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House of Representatives*, B-247155.2, 1993

these SEPs do not violate the Miscellaneous Receipts Act because cash portions of any total penalty package of relief in a settled case goes to the Treasury. Flagging that this "argument misses the point," the Comptroller described the problem as "allowing alleged violators to make payments to an institution other than the federal government for purposes of engaging in supplemental projects, in lieu of penalties paid to the Treasury." *Id*. at \*2.

Following the Comptroller General's opinion, EPA began modifying its SEP policy to address concerns regarding the policy's clash with the Appropriations Clause and the Miscellaneous Receipts Act. *See* Peterson, 2009 B.Y.U. L. REV. at 354-57. The Division and OLC assisted EPA with an aim of reducing litigation risk and strengthening the policy. EPA's process resulted in the release of an interim modified policy in 1995, which culminated in the release of a final modified policy in 1998. At no point during this period or at any other time have the OLC opinion in *Steuart* or the Comptroller opinions, however, been revoked or amended, according to my own review and to the research conducted at my direction.

EPA's SEP policy continued to evolve. The Agency released its current policy in 2015. It purports to contain "legal guidelines to ensure that SEPs are within the Agency's and a federal court's authority, and do not run afoul of any Constitutional or statutory requirements." 2015 SEP Policy at 7. In fact, however, EPA's policy establishes a mathematical relationship between the cost of an approved SEP and diminution of civil penalties, which purposefully trades penalties for projects and thus brings the Miscellaneous Receipts Act squarely into play.

The legal requirements that EPA describes in its 2015 policy fall into two categories, but they do not fully resolve the legal issues raised by SEPs.

The first category is intended to ensure that any settlement that includes a SEP is within the agency's and the Department's prosecutorial discretion. It attempts to ensure this by requiring that all SEPs have a sufficient nexus to the legal violations at issue by advancing at least one objective of the underlying environmental statutes supporting the enforcement action. *Id.* at 7-8.

The second category is intended to avoid improperly augmenting the agency's budget beyond the amount appropriated to it, or to otherwise avoid violating the Appropriations Clause and Miscellaneous Receipts Act. The SEP policy attempts to avert unlawful augmentation of EPA's appropriations by prohibiting SEPs that "provide resources (including, but not limited to, funding, services and/or goods)" for specific activities performed by any federal agency or on federally owned property. *Id.* at 10. A SEP may not be used to satisfy any federal agency's statutory obligations. *Id.* at 9. Nor may a SEP fund activities that Congress intentionally declined to fund. *Id.*

The SEP policy attempts to avoid violating the Miscellaneous Receipts Act by prohibiting EPA from playing any role in managing or controlling the SEP or the funds used to perform it. *Id.* at 8-9. The policy lists cash donations to third-parties and contributions for research at a college or university as examples of a types of projects that are not allowable as SEPs because cash donations "may create the appearance of a diversion of penalty funds from the Treasury in violation of the Miscellaneous Receipts Act." *Id.* at 17 & n.25. As noted above, however, this requirement does not overcome the fact that EPA has established a mathematical relationship

---

WL 798227 (Comp. Gen. March 1, 1993).

between the cost of a SEP and diminution of a penalty.  And the fact that EPA retains discretion to set the particular conversion rate as long as it does not *generally* exceed the ceiling rate of 80% does not ameliorate these concerns (recognizing that EPA reserves to itself the power to use any conversion rate, up to and including 100%, *see supra* n.4).   It is incorrect to treat prior opinions in this area from OLC and the Comptroller General as if they were limited to their facts (*i.e.*, no research projects, no donations to educational institutions), while overlooking the logic of those decisions or more general Executive and Legislative Branch determinations.

### D. The Attorney General's Policy Prohibiting Third-Party Payments

Though EPA's policy imposes some measure of restraint on SEPs, thereby ensuring that at least some potential SEPs are ruled out of bounds, SEPs remain legally suspect and are in serious tension with important aspects of our constitutional tradition.[13]  The House of Representatives has passed various bills over the years to prohibit payments to third parties (like those in SEPs) in Department of Justice settlements.[14]  No similar bills have passed the Senate, so none of the House bills prohibiting third-party payments have become law.

Most recently, in 2017, the House passed the Stop Settlement Slush Funds Act.  *See* H.R. 732, 115th Cong., 1st Sess. (2017).  Had it become law, the bill would have prohibited government officials from entering into settlements that provide for payments or loans to persons other than the United States, except for payments that directly remedy the actual harm caused by the violation at issue (*e.g.*, restitution).  *See* H.R. Rep. 115-72, at 2.  The House Committee Report summarizes the legal disputes underlying SEPs, which both the majority and dissenting members contemplated could fall within the bill's prohibition on third-party payments.  *Id.* at 5-6, 37-44.  The dissenting members described SEPs as beneficial projects that the bill would jeopardize if in-kind payments such as those in SEPs were interpreted as "payments."  *Id.* at 37-44.  By contrast, the majority described SEPs as devices to circumvent the Miscellaneous Receipts Act, *id.* at 5-6, and accordingly rejected amendments to the bill that would have exempted SEP-like provisions in settlements addressing indirect harms from violations of the Clean Water Act or Clean Air Act, *id.* at 14-15.

---

[13] At all times, SEPs have been based on EPA policies and EPA has been the core driver of the SEP device's use.  The Department's attitude toward them has been ambivalent, ranging from the condemnation of a SEPs-like arrangement in *Steuart* to the period in the 1990s when the Department worked with EPA to at least shave the rough edges off of the most abusive types of SEPs, while not endorsing them wholeheartedly.  The Division's personnel have generally supported SEPs before this time but certainly not unanimously.  In any event, SEPs in past judicial settlements have been reviewed and approved by both EPA and the Division.

[14]  *See* Stop Settlement Slush Funds Act of 2017, H.R. 732, 115th Congress (as passed by the House, October 24, 2017); Stop Settlement Slush Funds Act of 2016, H.R. 5063, 114th Congress (as passed the House, September 7, 2016); Make America Secure and Prosperous Appropriations Act, 2018, H.R. 3354, Sec. 540, Title V, Division C (as passed by the House, September 14, 2017) (part of an omnibus appropriations bill); Commerce, Justice, Science, and Related Agencies Appropriations Act, 2017, H.R. 5393, Sec. 539, Title V (as reported out of the House Appropriations Committee, June 7, 2016) (same text as in 2017) (the bill did not see House floor action); Commerce, Justice, Science, and Related Agencies Appropriations Act, 2016, H.R. 2578, Sec. 547, Title V (as passed by the House, June 3, 2015).

Although bills prohibiting third-party payments in settlements have not become law, the prohibition on payments to third parties has become the Department of Justice's policy.  On June 5, 2017, the Attorney General issued a policy prohibiting the use of payments or loans to non-governmental third parties in Department of Justice settlements.  *See* Memorandum from the Attorney General, Prohibition on Settlement Payments to Third Parties (April 20, 2017), *available at* https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-ends-third-party-settlement-practice.  The policy contains only three exceptions.  The policy does not apply to (1) "an otherwise lawful payment or loan that provides restitution to a victim or that otherwise directly remedies the harm that is sought to be redressed, including, for example, harm to the environment or from official corruption"; (2) "payments for legal or other professional services rendered in connection with the case"; and (3) "payments expressly authorized by statute, including restitution and forfeiture."  *See also* Justice Manual, § 1-17.00 (April 2018), *available at* https://www.justice.gov/jm/jm/1-17000-settlement-payments-third-parties.

On January 9, 2018, the Division issued a memorandum titled "Settlement Payments to Third Parties in ENRD Cases" ("January 9 Memo") that interpreted and applied the Attorney General's third-party payment prohibition in ENRD cases.  "Settlement Payments to Third Parties in ENRD cases," *available at* https://www.justice.gov/enrd/page/file/1043726/download.  Among other things, the memorandum purported to explain the exception to the Attorney General's prohibition that allows a third-party payment that "directly remedies the harm sought to be redressed . . . including harm to the environment."  The memorandum also lists various applicable general terms and conditions for third-party payments, including a blanket statement that the prohibition on payment or loans to non-governmental third parties in settlements does not apply to SEPs that are consistent with EPA's SEP policy because that policy prohibits cash payments to third-parties.  On September 4, 2019, however, I issued a memorandum suspending the January 9 Memo, pending further review of SEPs.  This Memorandum fully withdraws and supersedes the January 9 Memo on the basis of the law and logic set out in this Memorandum.

### E. The Attorney General's Policy Governing Civil Consent Decrees and Settlement Agreements with State and Local Governments

In November 2018, the Attorney General announced a new policy governing civil consent decrees and settlement agreements with state and local governments.  *See* Memorandum from the Attorney General, Principles and Procedures for Civil Consent Decrees and Settlement Agreements with State and Local Governmental Entities (Nov. 7, 2018) ("Nov. 2018 Memo" or "Policy"), *available at* https://www.justice.gov/opa/press-release/file/1109621/download.  The Attorney General directed that consent decrees "must not be used to achieve general policy goals or to extract greater or different relief from the defendant than could be obtained through agency enforcement authority or by litigating the matter to judgment."  *Id.* at 5.

On August 21, 2019, I issued a memorandum finding that the November 2018 Policy generally prohibited the use of SEPs in settlements with state and local governments because, by EPA's own definition, SEPs are projects agreed to in settlements that go beyond what is required under federal, state, or local laws.  Although I remained open to authorizing SEPs in certain settlements with state and local governments under an exception to the November 2018 Policy in the interim, pending my broader review of SEP policy more generally, that earlier memorandum made clear that such exceptions would be rare because of the important legal and policy

considerations underlying the November 2018 Policy, which are designed to achieve the appropriate constitutional balance between federal and state governments.

### F. The Executive Orders of October 9, 2019

On October 9, 2019, the President issued an Executive Order underscoring the importance of predicating adjudications on proper authority. *See* Executive Order on Promoting the Rule of Law Through Improved Agency Guidance Documents, Exec. Order No. 13,891 of Oct. 9, 2019, 84 Fed. Reg. 55,235 (Oct. 15, 2019). The main focus of this order is on "guidance documents," instruments by which agencies attempt to explain how they apply their statutes and regulations, but which from time to time transform into shadow regulation. As the President observes in this order, "[e]ven when accompanied by a disclaimer that it is non-binding, a guidance document issued by an agency may carry the implicit threat of enforcement action if the regulated public does not comply." *Id.* at §1.

On that same day, the President issued another related order emphasizing the importance of transparency and clarity in administrative adjudications by, *inter alia*, prohibiting the use of guidance documents to impose new standards of conduct on regulated persons. *See* Executive Order on Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication, Exec. Order No. 13,892 of Oct. 9, 2019, 84 Fed. Reg. 55,239 (Oct. 15, 2019). As the President states in this order, "[t]he rule of law requires transparency. Regulated parties must know in advance the rules by which the Federal Government will judge their actions." *Id.* at § 1. This language reflects the fundamental yet critical principle that the law must be accessible to the people who must abide by it. This language also reflects the understanding and expectation that people who participate in our representative system can conform their behavior to law, engaging it as citizens, but that doing so requires that the law be readily available.

While these Executive Orders can be characterized as not directly applicable to the EPA SEP policy, they inform my concerns about the validity of SEPs and the corresponding need to conduct a broader review of their continuing use in settlements.[15] EPA's 2015 SEP Policy is a nearly 50-page document that of contains standards about what does and what does not qualify as a SEP. The EPA 2015 SEP Policy, for instance, provides instructions on setting SEP completion deadlines, on which persons or entities can be employed to carry out SEPs, on setting stipulated penalties for not properly completing SEPs, on making SEP defendants jointly and severally liable for carrying out SEPs, and a host of other regulatory details. EPA also makes clear that the "ideas" for SEPs can begin with federal regulators; SEPs are not just acquiesced in by EPA. *See* 2015

---

[15] Both former Attorney General Sessions and former Associate Attorney General Brand determined that documents informing the public of factors the Department or an agency considers in exercising its enforcement discretion are not improper guidance documents. *See* Memorandum from the Attorney General to All Components, *Prohibition on Improper Guidance Documents* (Nov. 16, 2017) and Memorandum from the Associate Attorney General to Heads of Civil Litigating Components and United States Attorneys, *Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases* (Jan. 25, 2018). SEPs, however, because they are typically absent from statutory authorizations, are arguably different from a policy that specifies how Department of Justice enforcers will balance and weigh express statutory factors. This is why EPA's 2015 SEP Policy goes on for nearly 50 pages — it is not really addressing statutory factors with prescribed meanings; it must first describe the innovation of SEPs and when to use them.

SEP Policy at 1 ("Case teams should consider SEPs early in the settlement process and, in appropriate cases, provide SEP ideas to defendants."). Regulated parties identified as defendants in existing or impending enforcement actions bringing them to account may not be inclined to see such "ideas," however, as mere suggestions or "voluntary," shading them over into the territory of a *de facto* requirement.

Moreover, although SEPs, by their own terms, do not alter the standard by which the government establishes liability, they do rearrange the *ultimate sanction* to which any violator will be subject. SEPs render the portion of remedies that they cover open to a bargaining process that inherently places Executive Branch officials in the shoes of quasi-appropriators, deciding which environmental projects are worthy of funding and which are not. Worse yet, the array of SEP expenditures is inherently constrained; competing needs for the money across the full spectrum of federal spending needs is not considered by enforcers tasked with looking only at environmental issues. All of this is a notable departure from transparency and predictability (as well as from the basic constitutional order) that deprives the Congress and the people of benefits they might have experienced as a result of alternate expenditures of monies on projects funded by duly elected congressional appropriators instead of on the SEPs selected by a handful of Executive Branch officials.

It is in part for these reasons that I have conducted a broader review of SEPs beyond their use in consent decrees and judicial compromise settlements with state and local governments.

**DISCUSSION**

Having completed my broader review of SEPs I conclude that using SEPs in consent decrees and judicial compromise settlements must cease no matter whether the party agreeing to implement the SEPs is a state or local government or whether it is a private party. SEPs violate the spirit, if not the letter, of the Miscellaneous Receipts Act, which is intended to protect Congress' constitutional power of the purse.[16] The Division will no longer compromise civil penalties that would otherwise be deposited in the Treasury in exchange for performance of projects. It does not matter whether the SEPs provide for direct monetary payments to a third-party or indirect payments to a third-party through in-kind contributions of goods and services. Using SEPs in settlements in either situation is inconsistent with the spirit and the letter of the law as well as DOJ policy and therefore must cease in the litigation the Division is involved in.

**I.    SEPs Contravene Long-Established Principles Prohibiting the Diversion of Funds Away from the Treasury.**

Under EPA's 2015 SEP Policy, an alleged violator will (all other things being equal) pay a civil penalty lower than it would otherwise pay by voluntarily agreeing, as part of a settlement, to undertake an environmentally beneficial project closely related to the violation being resolved. But that goes beyond what is required under federal, state, or local laws. 2015 SEP Policy at 21.

---

[16] The Antideficiency Act may also be a relevant consideration. *See* Memorandum from Jeffrey Bossert Clark, Assistant Attorney General, Using Supplemental Environmental Projects ("SEPs") in Settlements with State and Local Governments at 2-3, 7 (Aug. 21, 2019), *available at* https://www.justice.gov/enrd/page/file/1197056/download.

- 11 -

At their most basic level, SEPs allow alleged violators to expend funds on projects benefitting third parties that otherwise would go to the Treasury as miscellaneous receipts for Congress to appropriate as it sees fit.  This diversion of funds away from the Treasury (and away from congressional control) to support special projects that EPA (with Department input) and the alleged violator favor contradicts core principles of our constitutional government.  It is also inconsistent with sound public policy.

Although EPA's policy has tamped down the probability of the most serious violations of the law, it largely leaves unaddressed fundamental problem with SEPs—that they "allow[] alleged violators to make payments to an institution other than the federal government for purpose of engaging in supplemental projects, in lieu of penalties paid to the Treasury." 1993 Comp. Op. at *2; *see also Public Interest Research Group of New Jersey v. Powell Duffryn Terminals, Inc*., 913 F.2d 64, 82 (3d Cir. 1990) (collecting cases holding that monetary penalties received for Clean Water Act violations must be deposited in the U.S. Treasury as miscellaneous receipts).

The tension between SEPs and governing legal principles has been apparent since at least 1980, when OLC first articulated the principle that "[m]oney available to the United States and directed to another recipient is 'constructively received' for purposes of the [Miscellaneous Receipts Act]." 1980 OLC Op. at 688.  OLC has further articulated that "[t]he fact no cash actually touches the palm of federal officials is irrelevant … if a federal agency could have accepted possession and retains the discretion to direct the use of the money." *Id.*  As this analysis suggests, if EPA could accept a higher penalty in a consent decree or settlement but instead forgoes that amount in favor of allowing the alleged violator to use the forgone funds to finance projects supporting EPA's mission that Congress has not approved, basic constitutional and statutory principles will be transgressed.  In its consent decrees or settlements that include SEPs, EPA not only retains discretion to direct use of the money, but EPA actually *does* direct the use of the money by requiring through the settlement agreement that diverted funds be spent on SEPs.  1980 OLC Op. at 688.  This is essentially the same scenario that OLC said in 1980 was unlawful.

A significant feature of EPA's 2015 SEP Policy is its nexus requirement, which ensures that SEPs have at least some conceptual connection to the violations at issue.  In some situations, this requirement may alleviate the most obvious and egregious difficulties that SEPs present.  Yet, in other cases, the nexus requirement itself creates tension with the anti-augmentation principle underlying the Miscellaneous Receipts Act and similar statutes.  Ultimately, however, the nexus requirement does not resolve the problem.  To be sure, the nexus requirement is intended to ensure that any settlement that includes a SEP is within the Attorney General's prosecutorial discretion.  And the Comptroller General offers his legal view as well that the Attorney General may, as part of his responsibility to litigate on behalf of the United States, agree to settlements that differ from relief that an underlying statute might authorize, so long as the violation and the relief have an adequate conceptual relation.  But this cannot mask the fact that, with SEPs, money otherwise destined for the Treasury finds its way to another destination, not at the insistence of Congress, where the Constitution puts that authority, but instead at the insistence of an administrative agency, or a non-federal entity, or some combination thereof.  As the Comptroller General has concluded, an agency "may not circumvent the receipts of a penalty to accomplish a separate objective." 1983 Comp. Gen. Op. at *2.

The conclusions of this Memorandum are boosted by the strict manner in which former Attorney General Benjamin Civiletti interpreted another relevant statute—the Antideficiency

Act—in 1981.  In late September 1980, it became apparent that Congress would not enact most of the customary appropriations for the new fiscal year.  With this event on the horizon, the Attorney General approved a "guidance" memorandum to directors of federal agencies on September 30, 1980.  This document explained, in relatively simple terms, what kinds of disbursements a director could approve in the absence of appropriations.  When the dust settled after that situation, President Carter asked the Attorney General for "a close and more precise analysis of the issues raised by the September 30 memorandum."  He presented this analysis to the President on January 16, 1981, just before he left office.  He concluded that, upon an expiration of appropriations, federal officers and employees may continue to incur liabilities, but only to the extent permitted by the Antideficiency Act.

This Act comprises two sections, 31 U.S.C. §§ 1341 and 1342, only the first of which bears on this Memorandum.[17]  Title 31, Section 1341 of the United States Code provides that "[a]n officer or employee of the United States Government . . . may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; [or] involve [that] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law."

The Attorney General began his analysis by noting that this section confirmed the basic rule that payments from the Treasury require supporting appropriations.  *See* 5 Op. Off. Legal Counsel at 2 (1981) (discussing 4 Op. Off. Legal Counsel 16 (1980)).  He then addressed the section's exception for obligations in advance of appropriations "authorized by law."  The issue here was whether an agency's broad statutory authority to carry out a particular program, such as the Post Office's authority to deliver the mail, constituted an obligation "authorized by law."  His answer was largely in the negative:

> [S]tatutory authority to incur obligations in advance of appropriations may be implied as well as express, *but may not ordinarily be inferred, in the absence of appropriations, from the kind of broad, categorical authority, standing alone, that often appears, for example, in the organic statutes of government agencies*.  The authority must be necessarily inferable from the specific terms of those duties that have been imposed upon, or of those authorities that have been invested in, the officers or employees [in question].

*Id.* at 4 (emphasis added).  He added:

> This rule prevails even though the obligation of funds that the official contemplates may be a reasonable means for fulfilling general responsibilities that Congress has delegated to the official in broad terms, but without conferring specific authority to enter into contracts or otherwise obligate funds in advance of appropriations.

*Id.* at 4-5.

---

[17] Section 1342 addresses acceptance of voluntary services for "emergencies involving the safety of human life or the protection of property."  At that time, the Antideficiency Act was codified at 31 U.S.C. §§ 665(a), (b).

There is much to be learned from this analysis. Most particularly, we must not proceed based on broad statutory authority to permit disbursements from the Treasury absent adequate and "specific authority." Instead of either generating funds for the Treasury, compensating professionals who support prevailing parties, or ameliorating an identified violation that Congress has specifically empowered the agency to ameliorate, the vast majority of SEPs are no more than "a reasonable means for fulfilling general responsibilities that Congress has delegated to [an] official in broad terms." The money, goods, or services at issue in SEPs never touch the Treasury, but the point is precisely the same. These are putative accounts receivable by the United States, and as such they are subject to the strict principles described above.

The preexisting approach to SEPs takes an overly literal and overly narrow view of the prohibition on exchanging extra-statutory relief for a reduction in monetary payments. EPA's SEP policy prohibits direct cash payments to third parties in exchange for a reduction in monetary penalties because such payments "may create the appearance of a diversion of penalty funds from the U.S. Treasury in violation of the Miscellaneous Receipts Act." 2015 SEP Policy at 17 & n.25. But these same appearances are present with in-kind payments like those in SEPs. If direct monetary payments are unallowable, then so too should in-kind payments. In appearance and effect, in-kind payments are no different than direct monetary payments. Indeed, EPA's SEP policy recognizes this similarity where it attempts to avoid augmentation problems by prohibiting SEPs that "provide additional resources to support (*including in-kind contributions of goods and services*)" specific activities performed by any federal agency or on federally owned property. *Id.* at 9-10 (emphasis added).

EPA's SEP policy is correct to recognize that in-kind payments of goods and services for specific activities performed by any federal agency or on federally owned property raises concerns. But directing funds that might have been deposited into the Treasury to pay for in-kind contributions of goods or services for projects that Congress has not approved or funded does the same. *See Steuart Transp.*, 4B Op. O.L.C at 684-85; 1993 Comp. Gen. Op. at *2. In all cases, reducing the amount of a penalty to be paid to the Treasury in exchange for the payment of money or in-kind good or services to a third-party for activities that Congress either intentionally funded to a specific level, intentionally declined to fund, or simply had no occasion to consider raises the same problem.

Those advocating for SEPs argue that SEPs are just one of many factors EPA considers when it acts to inform negotiations concerning the amount of penalty in a consent decree or settlement. They argue that no money is due or owing to the Treasury until an agreement is struck, analogizing to other situations where the agency and violator must negotiate an amount of penalty. But the fundamental problem with SEPs is the *purposeful* trading of lower monetary penalties for projects not approved by Congress—a problem that does not often arise in non-SEPs settlements. The purposeful nature of this trade is made evident in EPA's approach of equating up to 80% (or sometimes even higher) of a SEP to an equivalent civil penalty amount.

Relatedly, supporters of SEPs further argue that a defendant who agrees in settlement discussions to perform a SEP should receive a lesser fine because performing the SEP reduces the severity of the underlying offense. Not so. The severity of the underlying offense is a historic fact by the time any enforcement action would even kick off. SEPs are not time machines that can return to the point of the offense and soften the blow of an impending violation to the public or the environment. Moreover, it makes no sense to imagine that a violator on the brink of breaking the

law considers the future prospect of SEPs, if caught after the violation or even *in flagrante delicto*, to offset the offense, precisely because SEPs are so indeterminate, being subject to EPA's on-the-spot discretion, coupled with whatever additional span of discretion the Division also interjected into the process when adding its agreement to EPA's, thus authorizing a SEP.

Relatedly, while EPA's SEP policy requires SEPs to have a nexus to the underlying offense, the nexus is necessarily indirect. The policy does not require that SEPs directly remedy the actual harm caused by the violation in a manner that can be seen as ameliorating in some way the consequences of the underlying offense. If SEPs had such a direct connection to the actual harm caused by the underlying offense, SEPs would not be SEPs, because the projects would be authorized by law as forms of restitution or injunctive relief. However, SEPs by design and intent *exceed* what is required under federal, state, or local laws, and therefore are prohibited under the terms and logic of this Memorandum and the sources of law it enforces.[18]

It also has been argued by advocates for SEPs that the Division and OLC have reviewed and approved of EPA's SEP policy. It is true that OLC advised the Division and the Division advised EPA on versions of that policy, providing advice to minimize litigation risk. Advising on how to minimize litigation risk is not the equivalent, however, of making an affirmative determination that in-kind exchanges of benefits for a reduction in monetary penalties is either legally permissible or good public policy. No amount of lawyering can save devices as flawed as SEPs, which, by their intended purpose and design, exchange penalties for Executive Branch-selected projects in contravention of both statutory authority and the Constitution.

---

[18] Like the Attorney General's third-party payment prohibition policy, the policy and legal analysis announced herein does not apply to payments that *"directly* remed[y] the harm that is sought to be redressed [in a case], including, for example, harm to the environment . . . ." Attorney General Memorandum on Prohibition on Settlement Payments to Third Parties (June 5, 2017) (emphasis added). In keeping with the attentiveness to the separation of powers expressed throughout this Memorandum, however, I construe the adverb "directly" in this policy strictly, to refer to the various forms of injunctive relief intended to remediate the harm actually at issue in the matter under review. Thus, for example, settlement provisions resolving claims under CWA § 404 that require payment to a mitigation bank or the funding or undertaking of projects to mitigate the actual harm caused by the underlying wetlands violation are not affected by this Memorandum.

In fact, now that the Division is prohibited from seeking judicial SEPs, as such, we should see an increase in classic forms of injunctive relief explicitly identified as such. This is because, in the past, relief explicitly denominated as injunctive did not qualify for the up to 80% discount on civil penalties, whereas the same project, denominated as a SEP, would so qualify. In other words, defendants had an incentive to label as much injunctive relief as possible as a SEP, so that the total cost of relief would trigger a penalty offset. Thus, with SEPs eliminated as an option, charged parties will lose this incentive to denominate injunctive relief as a SEP. This result is also consistent with EPA's own stated policy objectives. *See* 2015 SEP Policy at 1 ("Where a proposed project could reasonably comprise part of the injunctive relief portion of a settlement, it should not be a SEP.").

## II.     Sound Public Policy Does Not Support the Use of SEPs.

As discussed in my state and local SEPs Memorandum, there are compelling public policy considerations—apart from the legal considerations—for not allowing SEPs in consent decrees or compromise settlements with the state and local governments. Aug. 2019 Memo at 12-13. Those considerations include that SEPs could (1) intrude on state and local accountability, by allowing the Executive Branch to commit state and local taxpayers to funding projects not otherwise required by their laws; (2) give oversight of these voluntary projects to a federal court, and subject SEP violations to the contempt power; and (3) allow state and local officials to commit to projects that are contrary to the express or implied will of the state or local legislative branches. *Id.*

Although these considerations do not all apply to SEPs in settlements with private parties, more general concerns do apply to all SEPs. Before discussing those concerns, I must acknowledge that the regulated community (both state and local governments and businesses alike) and many within the Executive Branch remain fond of SEPs. As one supporter of SEPs (former EPA Regional Administrator Francis Lyons) told a reporter, "SEPs are very popular with settling parties who would rather perform a project and pay less money to the Treasury Department." *DOJ Blocks Attorneys from Favored Settlement Tool*, LAW360 (Oct. 31, 2019). In contrast to the cold reality of paying a monetary fine to the Treasury, SEPs allow defendants in enforcement actions to generate goodwill by funding projects benefitting some portion of the communities negatively affected by their legal violations. This goodwill makes it easier to "sell" the settlement to a corporate board of directors, which, in turn, makes settlement easier for all parties involved, including for the United States. SEPs, of course, also benefit the constituencies fortunate enough to be blessed as beneficiaries of the SEP monies and their related projects. These constituencies thus have their own form of vested interest in not seeing SEPs as a device prohibited. Finally, EPA will even approve some SEPs wherein defendants can reap profits by agreeing to such a project. *See* 2015 SEP Policy at 32.

But one cannot recognize the benefits of SEPs without acknowledging that SEPs are, with a handful of exceptions, purely a creation of the Executive Branch.[19] No matter how well-intentioned SEPs are, by their design and intended purpose, SEPs reduce the amount paid into the Treasury (as Mr. Lyons acknowledges in his quotation), while simultaneously giving the Executive Branch discretion over how the monies diverted from the Treasury will be spent. This diversion of funds effectively makes the Executive Branch the quasi-appropriator of funds, yet the

---

[19] Of course, in situations where Congress has authorized SEPs, such SEPs are lawful. *See* Aug. 2019 Memo at 13. In this vein, 42 U.S.C. § 16138 authorizes EPA to accept diesel emissions reduction SEPs. Even then, however, Congress required any diesel-emissions reduction SEPs to satisfy certain criteria, including that the SEPs be "related to the underlying alleged violations." 42 U.S.C. § 16138. This means that the proposed SEP should have, *first*, a strict nexus both to (a) the geographical area affected by the underlying violation and to (b) the environmental pollutant involved in the alleged violation. Moreover, *second*, because Congress authorized diesel-emissions reduction SEPs to encourage the retrofitting or replacing of diesel engines in school buses and other mobile sources of pollution (S. Rep. 110-266), I direct that, as a matter of prosecutorial discretion, the Division will negotiate for diesel-emissions reduction SEPs only in mobile-source cases. *Third*, the Assistant Attorney General or applicable Division decisionmaker retains the ultimate authority to use prosecutorial discretion to decide whether a particular proposed SEP is consistent with the relatedness requirement of Section 16138.

Constitution clearly gives that power to Congress. *See* U.S. Const., art. I, sec. 8, cl. 1 (Taxing and Spending Clause); art. I, sec. 9, cl. 7 (Appropriations Clause). As first noted in the state and local SEPs memorandum, perhaps if asked, Congress would authorize funds for some categories of SEPs. But Congress may also prefer to spend those funds on, for instance, new infrastructure, protecting the public health, or new space missions. Absent a clearly expressed intention from Congress to delegate money-redirection authority to the Executive Branch, it is Congress and not the Executive Branch that should decide how to spend the funds stemming from a legal violation. Thus, declining to negotiate for SEPs merely leaves undisturbed Congress' prerogatives to decide how to spend monies housed in the fisc.

This constitutionally mandated dynamic bothers some supporters of SEPs who demean Congress' capacity to determine spending priorities, stating that "the alternative [to SEPs] is that the penalties just go to U.S. Treasury and buy a hubcap on a vehicle or something, rather than actually addressing the environmental problem." *DOJ Blocks Attorneys from Favored Settlement Tool*, LAW360 (Oct. 31, 2019) (quoting Peter Morgan, a senior attorney at Sierra Club). But while supporters of SEPs would like to see public funds used for their favored projects, our Constitution gives Congress every right to use those funds to purchase a hubcap if that bicameral collective body deems such an expenditure appropriate. Congress' power of the purse is not a random allocation. The legislature is uniquely suited for the hurly burly of debating important public issues. More than any other branch of government, it is deemed to represent the people as an aspect of the Republican Form of Government, U.S. Const., art. IV, sec. 4 (with Article I representing to and for the benefit of the States the paradigmatic example of such a form of government), and thus to speak for that polity as well. Congress has hundreds of members, representing distinct geographic districts. No member's vote counts more than that of any other, and each member has a direct, inalienable role in deliberation and voting.[20]

Moreover, the power of the purse has a long historical pedigree. The precedent that the government needs the consent of the legislature to exact money from the population, or to spend it in any particular way, is much older than the Founding Era, and represents the culmination of centuries of struggle between the Crown and Parliament.

Besides having a long historical pedigree, the principle of legislative control over appropriations occupies a central position in our scheme of separated powers. Little that government does can be effected without cost, vesting substantial authority in the branch of government ultimately directing such spending. The legislature's power to control the purse strings ensures that it retains irreducible powers to fashion and contain public policy. Without this power, the role of the legislature would be seriously compromised.

Congress may no doubt specifically authorize the Executive Branch to redirect money otherwise payable to the Treasury. *See Pacific Legal Foundation v. Goyan*, 664 F.2d 1221, 1226

---

[20] In *Federalist Paper 10* terms, it can confidently be said that SEPs are more likely to foment the evil of factions than allowing the broader Congress to make spending decisions. Republics "refine and enlarge the public views, by passing them through the medium of a chosen body of citizens, whose wisdom may best discern the true interests of their country, and whose patriotism and love of justice will be least likely to sacrifice it to temporary or partial considerations." James Madison, *Federalist* No. 10, in *The Federalist Papers*, ed. BiblioBazaar, at 65.

- 17 -

(4th Cir. 1981) ("the power to spend—constitutionally reserved to the Congress—may be delegated to others"). But Congress must provide a clear statement of its intent to do so, and it must specify "intelligible principles" to guide Executive action.[21] *See Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001). Congress has not spoken with the clear intent to give the Executive Branch the authority to negotiate for, or settle for, SEPs—except in one limited instance where it granted EPA authority to enter settlements that include diesel emission reduction SEPs— notwithstanding the Miscellaneous Receipts Act. *See* P.L. 110-255 (2008).[22] That Congress has given EPA the authority to settle using SEPs of a single type leads one to conclude, in *expressio unius est exclusio alterius* fashion, that Congress has not affirmatively approved of all forms of SEPs. Finally, even if SEPs were not *per se* unlawful, they tread too close to the line and should be disallowed as a matter of sound policy and prosecutorial discretion.

## III.  Implications

From this point forward, Division attorneys negotiating consent decrees or compromise settlements in EPA cases should not include SEPs in those settlements. This directive therefore supersedes (and revokes) the Division's January 9, 2018, memorandum providing guidance concerning the Attorney General's third-party payment prohibition in Division cases. Additionally, this Memorandum together with my August 21, 2019 Memorandum provide *two sets of grounds* barring (or, in the case of the August Memorandum, making more difficult) SEPs in consent decrees with state and local governments.[23] And, to signal that state and local SEPs are particularly problematic, both the August 21, 2019 Memorandum and this Memorandum will remain simultaneously in operation. In the event of any conflict between the earlier memorandum and this one, this later Memorandum will control.

I recognize that SEPs have been included in consent decrees and settlements since the 1980s. Because of this long history, I recognize the disruption this new policy could have on existing cases, particularly those in the final stages of negotiation where the parties have long included SEPs as part of the proposed settlement.[24] However, the August 21, 2019 Memorandum

---

[21] For example, clear statements to use funds to continue the construction of border barriers by the Department of Homeland Security exist in (1) the Treasury Forfeiture Fund (31 U.S.C. § 9705); (2) the Department of Defense's counter-drug support authority (10 U.S.C. § 284); and (3) the authority to reallocate funding from military construction projects, made available through the President's clear authority to issue a national emergency declaration (10 U.S.C. § 2808).

[22] In the 2001 National Defense Authorization Act, P.L. 106-398, § 315 (2001), Congress also appropriated funds to allow the Army and Navy to pay cash penalties assessed by EPA or to fund certain SEPs in satisfaction of a fine imposed by EPA. Because Congress authorized these steps, no money was diverted from the Treasury.

[23] The November 7, 2018 Memorandum of the Attorney General contains a policy permitting case-by-case exceptions to be afforded by the Deputy Attorney General or Associate Attorney General to that Memorandum's terms. *See id.* at 5, 7. By contrast, this Memorandum, which embraces both state or local *and* private consent decrees, along with other settlements, provides no such regularized path to exceptions, though, of course, I remain subject to the Department of Justice's chain of command.

[24] I am aware that violations of the Miscellaneous Receipts Act could potentially result in removal

put the Division and EPA on notice as to the legal difficulties surrounding SEPs. More importantly, however, I must emphasize that I do not have discretion to make exceptions to what is a sound construction of both statutory and constitutional law.[25]

---

from office. *See* 31 U.S.C. § 3302(d). By setting out the conclusions and analysis in this Memorandum, I do not in any way mean to suggest that any of the past or current dedicated attorneys and public servants at EPA or in the Department had any improper motives by negotiating SEPs or entering into or approving settlement agreements that contain SEPs. Those attorneys and public servants were acting in good faith based on then-prevailing understandings (and at EPA pursuant to guidance directives) at the time. *See* 2015 SEP Policy at 7 ("The evaluation of whether a proposed SEP is within the EPA's authority and consistent with all statutory and Constitutional requirements may be a complex task."). Further, this Memorandum does not suggest that oversight of SEPs that have already been approved by an appropriate judicial tribunal cannot continue.

[25] The August 21, 2019 and this Memorandum have focused exclusively on civil SEPs. I will next begin a project to review of the use of SEP-like devices in the criminal sphere.